IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 28, 2009

## STATE OF TENNESSEE v. DONALD EDWARD LYNCH

**Appeal from the Criminal Court for Sullivan County**
**No. S48,752    Jerry Scott, Senior Judge**

---

**No. E2008-01435-CCA-R3-CD - August 24, 2009**

---

A Sullivan County Criminal Court jury convicted the defendant, Donald Edward Lynch, of two counts of especially aggravated sexual exploitation of a minor, two counts of aggravated sexual battery, and six counts of rape of a child. He challenges his convictions, arguing that the video recording used in his conviction was discovered through an illegal search and seizure. He also challenges the legal sufficiency of the convicting evidence. We discern error in the judgments for Counts eight through 10 of rape of a child and remand for correction of clerical error. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part and
Case Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Gene Scott, Jr., Johnson City, Tennessee, for the appellant, Donald Edward Lynch.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Department of Children's Services ("DCS") contacted the Kingsport City Police Department in March 2003 to report suspicions of the sexual abuse of T.G.[1], born August 12, 1995, and S.G., born October 14, 1991. Based on information from DCS, officers of the Kingsport City Police Department investigated the defendant. Upon searching his home, the officers recovered several video recordings that displayed T.G. and S.G. naked and involved in sexual acts.

---

[1] It is the policy of this court to refer to minor victims of sexual offenses by their initials.

On January 21, 2004, the defendant was charged by presentment with one count of especially aggravated sexual exploitation of a minor, S.G. *See* T.C.A. § 39-17-1005 (1997). The presentment further alleged that the defendant committed the following offenses against T.G.: one count of especially aggravated sexual exploitation of a minor, *see id.*; two counts of aggravated sexual battery, *see id.* § 39-13-504; and six counts of rape of a child, *see id.* § 39-13-522. The State timely filed a notice of intent to seek enhanced punishment, a notice of enhancement factors, and a motion to impose consecutive sentences.

The defendant filed a pretrial motion to suppress the video recordings found at his home that displayed the victims. The trial court held a suppression hearing and denied the motion. After a two-day jury trial, the defendant was convicted of all counts. The trial court imposed concurrent eight-year, Range I sentences in the Tennessee Department of Correction ("TDOC") for the defendant's especially aggravated sexual exploitation of a minor convictions. He received concurrent eight-year sentences in TDOC as a violent offender for his aggravated sexual battery convictions to be served consecutively to his sexual exploitation convictions. The court ordered an effective 50-year sentence in TDOC as a child rapist, *see id.* § 39-13-523(b), for his six rape of a child convictions, to be served consecutively to his other convictions for a total effective sentence of 66 years.[2] After the trial court denied his motion for new trial, the defendant filed a timely notice of appeal.

*Suppression Hearing*

The defendant moved the court to suppress videotapes containing footage of S.G. and T.G. involved in sexual activities. The defendant argued that officers of the Kingsport Police Department conducted a warrantless search of his home on March 21, 2003. He argued that law enforcement officers asked for his consent only after first illegally searching his home and that all subsequent searches were inadmissible "fruit of the poisonous tree." He further maintained that any consent to search was unknowing or involuntary.

Officer Rick Marshall[3] of the Kingsport Police Department testified that Veronica Camp of DCS had notified him of allegations of child sexual abuse of S.G. and T.G. that had occurred at the defendant's residence. On the morning of March 21, 2003, Officer Marshall and Ms. Camp traveled to the defendant's residence in Kingsport, Tennessee. Officer Marshall testified that the defendant did not answer the door and that he left his business card asking the defendant to contact him. He maintained that he did not look into the defendant's windows or attempt to search his house at the time.

Officer Marshall testified that the defendant called him later that morning and agreed to meet him at the police department. Officer Marshall testified that, while on the telephone, he

_____

[2]The judgments further ordered that the defendant pay a $25,000 fine for Counts one through four and a $50,000 fine for Counts five through 10.

[3]In 2003, Officer Marshall worked as a detective for the Kingsport Police Department; however, at the time of trial, he no longer held the position of detective.

informed the defendant of the subject about which he wanted to speak with him. The defendant arrived at the police department, and Officer Marshall informed him of his *Miranda* rights. Officer Marshall testified that the defendant was not under arrest but that he asked the defendant to sign a waiver of his *Miranda* rights. He maintained that he used no coercion, threats, or promises in his interview with the defendant.

Officer Marshall testified that he transcribed the defendant's statements and that he reviewed the statement with the defendant before the defendant signed it. Officer Marshall testified that he asked if he could visit the defendant's home to search for videotapes possibly involving T.G. and S.G. Officer Marshall stated that the defendant provided verbal consent to search his home. The defendant left the police station and drove himself to his residence, where he met Officer Marshall and Ms. Camp. Officer Marshall testified that the defendant allowed them into the residence and that they began searching for videotapes.

Explaining the inside of the defendant's home, Officer Marshall said, "Mr. Lynch collected a lot of things: tools, there was several different types of tapes like that you buy at the store with the regular and the homemade videos, and just a lot of – a lot of items inside the house." Ms. Camp informed Officer Marshall that she found videotapes with labels displaying the victims' names in the kitchen and underneath the kitchen cabinet. He and Ms. Camp obtained 15 videotapes reflecting the victims' names or initials from the defendant. He testified that the defendant permitted them to take the videotapes. Officer Marshall testified that, when he and Ms. Camp found the tapes, the defendant stated that "he guessed he was in trouble."

Officer Marshall viewed the videotapes at the police station. He said, "We [saw] evidence of child sex abuse on the tapes, little girls naked and – and different things as such on the tapes." He testified that the girls in the video recordings were obviously less than 18 years old. At that point Officer Marshall contacted a senior detective, David Quillen, and the two officers returned to the defendant's house to search for more evidence. Officer Marshall testified that the defendant was not under arrest at this time.

Upon arriving at the defendant's home, Officer Marshall obtained written consent from the defendant to search his home. He and Mr. Quillen obtained 63 videotapes. Upon review, only one of the tapes contained images of the victims. This video recording, however, was ultimately the only videotape used to convict the defendant at trial.

On cross-examination, Officer Marshall admitted that he made no video or audio recording of the defendant's interview, but he noted that Ms. Camp was present for the interview. He testified that he never used recording devices in his interviews. Officer Marshall maintained that, under Kingsport Police Department policy, he was permitted to search a residence when given either oral consent or written consent. He had no explanation as to why he did not obtain written consent when he and Ms. Camp first searched the residence.

Mr. Quillen, a former detective who worked in the private sector at the time of trial, testified that he aided Officer Marshall in his second search of the defendant's home on the afternoon of March 21, 2003. He testified that Officer Marshall obtained the written consent to search the

home and that the defendant appeared to give consent knowingly and voluntarily. He testified that of the 63 videotapes collected, one displayed a label indicating footage of the victims. He testified that they searched the home for approximately 30 minutes.

The defendant testified that he met with Officer Marshall voluntarily on March 21, 2003, because Officer Marshall wanted to speak with him about a "pressing matter." He said that Officer Marshall informed him of complaints of his abusing T.G. and S.G. When asked whether he consented to a search of his home, the defendant replied, "Well, I figured [Officer Marshall] was going to meet me up there and we'll talk about it. And they followed me up there." At another point in his testimony, the defendant said that he told Officer Marshall to "come on up" and that it was "[n]o problem." He stated that he allowed Officer Marshall and Ms. Camp into his home and said, "Yeah, just come on in, look around." He stated that he could not recall signing a document consenting to a search, but when confronted with the signed form, he admitted that the consent form contained his signature. The defendant maintained that he never gave oral consent to search before signing the form. He further explained that he signed the form without reading it and did not know that he was consenting to a search of his home.

The defendant testified that he became upset when Officer Marshall informed him that he was taking videotapes from his residence. He testified that he told Officer Marshall, "Whatever," and that he did not believe he could refuse his taking the videotapes.

At the end of the hearing, the trial court found that on March 21, 2003, the defendant voluntarily went to the Kingsport Police Department as a result of Officer Marshall's leaving his business card at his residence. The court found that the defendant was not under arrest but that Officer Marshall had advised the defendant of his *Miranda* rights. The court found that the defendant drove himself home, separately of Officer Marshall, after his interview at the police station. It noted that the defendant testified that he told Officer Marshall and Ms. Camp to come in the home and look around. The trial court found that Officer Marshall and Ms. Camp found videotapes involving the children mentioned by the defendant during his interview at the police station, and that the defendant responded, "I guess I'm in trouble now." The trial court found that Officer Marshall and Mr. Quillen returned to the home and that the defendant signed a consent form with an understanding of its consequences. It found that 63 videotapes were taken from the defendant's house as a result of this search.

In light of these findings, the trial court held that all searches of the defendant's residence were constitutionally valid and denied the defendant's motion to suppress.

*Trial*

Officer Marshall's trial testimony closely followed his suppression hearing testimony. Officer Marshall testified that, during his interview with the defendant, the defendant explained that he had "started watching [S.G. and T.G.]" because they lived near his residence. The defendant

-4-

stated that he "thought [S.G. and T.G.] were underpriv[i]leged kids so [he] wanted to help them out." The defendant's signed statement from March 21, 2003, was admitted into evidence. The statement reflected that the defendant watched over the victims for approximately a year but that he had not kept the girls during the seven months preceding his interview. The defendant told Officer Marshall that he took the victims on trips to the mall and the zoo and that he attended their school events. He said that the victims' mother would leave the children with him and then ask for money so she could go to dance clubs.

The statement said that the victims on occasion spent the night with the defendant and slept in two separate bedrooms while the defendant slept on his couch. He maintained that he sometimes slept naked and that, on one occasion, the victims possibly observed him while sleeping uncovered and naked on his couch with "a[n] erection from a dream." The defendant, through his statement, said that S.G. "use[d] to [sit] on [his] lap sometime and she would hunch and [he] told her not to do that . . . ."

The statement reflected that he "played more with [T.G.] . . . because she was younger and people use[d] to pick on her." The defendant believed that the victims may have seen him exposed when he forgot to close the bathroom door. The defendant's statement said that he would "play wrestle" with the victims and "sometimes it could be possible that [his] hand would accidentally slip up and go under th[eir] nightgown[s]." He further mentioned that the victims "could have accidentally touched [him] on [his] penis" while wrestling. The defendant also would lie with T.G. until she went to sleep, and he noted that it was possible that he may have done so while in his boxer-shorts.

In his statement, the defendant admitted that he "t[ook] naked videos of older women that are over 18 but [that he has] never t[aken] any naked pictures or videos of [S.G.] or [T.G.]." He mentioned that he had taken one picture of T.G. when she was five or six years old and would "always run around in her panties."

Officer Marshall testified that he and Mr. Quillen found a videotape upon searching the defendant's residence after obtaining his written consent. The label of the tape had abbreviations of the victims' names, and it stated "1st Aug, 2002," "more Aug 7, 2002," and "more Aug 24, 2002–Aug 25th 2002." The label also read, "[T.G.] now 7 yr. old." Officer Marshall testified that he recognized the defendant's voice in the background of the video recording. He also determined that the video was recorded in the defendant's home, and he presented photographs that he made of the defendant's home.

Officer Marshall testified that he spoke with the defendant after reviewing the recording and obtaining a warrant for his arrest. He stated that the defendant told him he would turn himself in at the police station but that he never arrived at the station.

Mr. Quillen's testimony also reflected that of his testimony given at the suppression hearing. He testified that he had reviewed the videotapes several times and identified the male voice in the recordings as the defendant's. Mr. Quillen also verified that the video recording was made in the defendant's home. Mr. Quillen testified that the defendant's nickname was "Donny" and that

a portion of the videotape shows T.G. saying, "Hey, Donny, look at me." He testified that he reviewed other videotapes seized from the defendant's residence and that the defendant appeared in other recordings. Mr. Quillen testified that the defendant was not arrested until October 18, 2003, when he was found in New York City.

The State offered as exhibits the victims' birth certificates showing that S.G. was born October 14, 1991, and that T.G. was born on August 19, 1995. The defendant's consent to search form and Officer Marshall's photographs of the defendant's home were also entered into evidence.

The State further admitted a digital video disc, reproduced from the aforementioned videotape, depicting S.G. and T.G. naked and performing sexual acts. The State pointed to specific instances in the video recording that corresponded with each criminal charge. The video recording showed two instances where an adult male hand touched T.G.'s buttocks, which corresponded with Counts three and four of aggravated sexual battery. The video recording then displayed six occurrences of the male hand touching T.G.'s genital area, which corresponded with Counts five through 10 of rape of a child.

The State rested, and the defendant chose not to testify. Based on the evidence as summarized above, the jury convicted the defendant as charged on all ten counts.

*Issues on Appeal*

The defendant challenges his convictions on appeal. First, the defendant argues that the trial court erred in denying his motion to suppress the videotape used to convict him. The defendant maintains that the videotape was discovered as a result of an illegal search and seizure. The defendant further challenges the legal sufficiency of the convicting evidence. He argues that the evidence presented to the jury did not support its finding that the man in the video recording was the defendant. The defendant further argues that the video recording does not support his six child rape convictions because the touching of T.G.'s genital area did not constitute digital penetration as required by statute.

*I. Suppression of Videotape*

The defendant argues that, despite his signing a consent to search form that led to the discovery of the illicit videotape admitted into evidence, he did not read the consent form and did not intelligently give Officer Marshall consent to search his home. Upon our review, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *See State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). As part of our review, the "[t]estimony presented at trial may be considered . . . in deciding the propriety of the trial court's ruling on a motion to suppress." *State v. Perry*, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999); *see also State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). Furthermore, we review the trial court's conclusions of law under a de novo standard without according any presumption of

correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

As a general rule, a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure.

It is well settled that a search conducted pursuant to a voluntary consent is an exception to the warrant requirement. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973)). A consent to search must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998)). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007). Because voluntariness of consent is a question of fact, the trial court's finding of voluntariness will be upheld unless the evidence preponderates otherwise. *Odom*, 928 S.W.2d at 23.

In the present case, the defendant testified that he initially allowed Officer Marshall and Ms. Camp into his home and gave them permission to "look around." Prior to the second search, which produced the videotape at issue, the defendant signed a form entitled "Individual Consent for Search." The trial court found that the defendant understood the form, and the evidence does not preponderate against this finding. Mr. Quillen testified that the defendant appeared to give consent knowingly and voluntarily. At trial, Officer Marshall testified that he did not use any force or coercion in obtaining the defendant's signing of the consent form. He further testified that he advised the defendant of the contents of the consent form prior to the defendant's signing it. Under these circumstances, the trial court had a basis for concluding that the defendant's consent was voluntary or knowing, and we uphold the trial court's denial of his motion to suppress.

## II. Sufficiency of the Evidence

The defendant argues that the jury was presented with inadequate evidence identifying him as the man committing sexual offenses in the video recording. Further, he argues that although the recording shows contact with T.G.'s genital area, the contact does not amount to penetration as required under the child rape statute. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

### a. Identity

In the defendant's first sufficiency argument, he challenges only his identity as the perpetrator of those offenses. The defendant argues that the video recording never showed the defendant's face and that, because no eyewitness testimony identified the defendant as the offender, the jury was not provided with sufficient evidence to support his convictions. We disagree. Both Officer Marshall and Mr. Quillen identified the voice in the video recording as the defendant's voice. Further, both men had seen the defendant's home and testified that the video recording took place in his home. The video recording shows T.G. refer to the person making the video recording as "Donny," and Mr. Quillen testified that "Donny" was the defendant's nickname. The defendant admitted, through his statement to Officer Marshall, that he had watched over the girls identified in the videotape, although he denied video recording them naked. The videotape was found in the defendant's residence, and Mr. Quillen testified that other tapes found in the home showed the defendant's face. Lastly, the defendant fled to New York City to avoid arrest for approximately seven months. Upon our review, we note that the evidence overwhelmingly proved that the defendant created and participated in the video recording, and we will not disturb the jury's verdicts.

### b. Sexual Penetration

The defendant next argues that "while the video shows someone touch the private parts of the juvenile victims it does not show sufficient evidence by which a jury could find digital penetration as alleged in the indictments." Rape of a child is "the unlawful sexual penetration of a victim by the defendant" when the victim is less than 13 years of age. T.C.A. § 39-13-522 (1997). Code section 39-13-501 defines "sexual penetration" for the purposes of this case as "any . . . intrusion, however slight, of any part of a person's body or of any object into the genital . . . openings of the victim's . . . body." *Id.* § 39-13-501(7). Our supreme court has explained that, when the victim is a female, "[i]t is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

The video-recorded evidence clearly shows six instances of rape of a child. On each occasion, the defendant uses his fingers to enter T.G.'s vulva and then spreads his fingers to expose the inside of her vaginal area to the video camera. Such an intrusion is clearly penetration under our statutory scheme, and we will not disturb the jury's verdicts of rape of a child.

### III. Sentencing Errors

Lastly, we must note an error in some of the judgments of conviction. The judgments correctly reflect two concurrent eight-year sentences for the aggravated sexual battery convictions running consecutively to two concurrent eight-year sentences for the sexual exploitation of a minor convictions for Counts one through four. Thus, the defendant received an effective 16-year sentence for Counts one through four. The judgment for Count five, child rape, orders a 25-year sentence to run consecutively to Counts one through four. The judgment for Count six, child rape, orders a 25-year sentence to run consecutively to Counts one through five. According to the judgments, the defendant received an effective 66-year sentence for Counts one through six.

The judgment for Count seven orders a 25-year sentence to be served concurrently with Counts one through six, maintaining the sentence at 66 effective years. The judgment for Count eight, however, contains a facial error. The judgment orders a 25-year sentence to run concurrently with Count seven but consecutively with Counts one through six. As noted above, Count seven already runs concurrently with Counts one through six; therefore, Count eight cannot run both consecutively and concurrently to the same sentence. The judgments for Counts nine and 10 also order that they run concurrently to Count seven but consecutively to Counts one through six.

As written, the judgments for Counts eights through 10 are incorrect. However, we note that the sentencing hearing transcript reflects that the trial court intended for the defendant to serve an effective 66-year sentence. When there is a conflict between the transcript and the judgment form, the transcript controls. *See, e.g.*, *State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991); *State v. Jimmy Lee Cullop, Jr.*, No. E2000-00095-CCA-R3-CD, slip op. at 14 (Tenn. Crim. App., Knoxville, Apr. 17, 2001) (remanding for correction of sentence alignment in judgment form to conform to alignment reflected in transcript). The judgments may be corrected to order the intended 66-year sentence by removing the order that the sentences for Counts eight through 10 be served consecutively to Counts one through six. In light of this analysis, we remand to the trial court for correction of the judgments for Counts eight through 10 in accordance with this opinion.

### Conclusion

We remand to the trial court to strike all orders for consecutive sentencing from the judgments for Counts eight through 10. In all other aspects, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE