IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 3, 2007 Session

**STATE OF TENNESSEE v. ERIC BERRIOS**

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 04–03042     Paula Skahan, Judge**

---

**No. W2005-01179-SC-R11-CD - Filed August 17, 2007**

---

The defendant, Eric Berrios, was charged with one count of possession with intent to sell or deliver more than three hundred grams of cocaine. After the trial court granted the defendant's motion to suppress the cocaine seized during the traffic stop, the State was granted an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The Court of Criminal Appeals affirmed the suppression of the evidence. We granted the State's application for permission to appeal to determine whether the officer's actions amounted to an unconstitutional seizure and, if so, whether the defendant's consent to search the vehicle was sufficiently attenuated from that illegal act. Because the seizure violated constitutional safeguards and because the consent to search was not sufficiently attenuated from the violation, we affirm the suppression of the evidence. The judgment of the Court of Criminal Appeals is, therefore, affirmed.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and CORNELIA A. CLARK, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; William L. Gibbons, District Attorney General; and Valerie Smith, Assistant District Attorney General, for the appellant, State of Tennessee.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellee, Eric Berrios.

**OPINION**

On February 25, 2004, Officer Kelly Nichols of the West Tennessee Drug Task Force observed Eric Berrios ("the Defendant") driving fifty-three miles per hour in a construction zone on Interstate 40 in Shelby County. The posted speed limit for the area was forty-five miles per hour. When Officer Nichols activated his emergency equipment, the Defendant stopped his vehicle on the

shoulder of the highway. The officer then approached the vehicle on the driver's side, asked the Defendant for his license and vehicle registration, and directed him out of the vehicle. After glancing at the license and registration, Officer Nichols frisked the Defendant and led him to the backseat of the patrol car. The Defendant was questioned and ultimately agreed to the officer's request for consent to search the vehicle. A large amount of cocaine was hidden in the fender area of the vehicle.

## Factual and Procedural Background

At the hearing on the motion to suppress, Officer Nichols, testifying for the State, stated that he directed the Defendant outside of the vehicle for safety reasons. He explained that "police officers working on highways happen to be more likely to be run over by vehicles than shot and killed by a suspect." Later in his direct testimony, he added that the cold and rainy weather was another reason to place the Defendant in the patrol car. Officer Nichols performed a pat-down search for weapons before putting the Defendant in the patrol car but found none. At the hearing, he pointed out that it was his practice to frisk every person he placed in the back of his vehicle.

While inside the patrol car, the Defendant was asked a number of questions about his automobile, his travel plans, and his business. Officer Nichols also telephoned the United States Customs Service to verify the validity of the Defendant's driver's license and registration and to determine whether the vehicle had recently crossed the border from Mexico. While awaiting the results of his inquiry, the officer asked for and received consent to search the vehicle.

As he looked under the hood of the vehicle, Officer Nichols discovered that the bolts holding the fender in place had been removed and replaced. After unsuccessfully attempting to remove the fender, he called for Sergeant Mike McCord to assist in the search, explaining that Sergeant McCord "had a narcotics detecting canine and also . . . had experience in searching vehicles." The dog alerted to the front fender area, and the two officers drilled into the fender, discovering more than three hundred grams of cocaine hidden in the firewall of the fender.

During cross-examination, Officer Nichols conceded that the Defendant was cooperative during the stop. He also acknowledged that he had seen nothing in the interior of the car that caused him to fear for his safety or led him to suspect any criminal activity other than speeding. The officer admitted that he did not believe that the Defendant was either armed or dangerous. Upon further questioning, Officer Nichols explained that because the Defendant appeared nervous during the initial encounter, his purpose in placing the Defendant in the back of the patrol car was to determine whether the anxiety level of the Defendant would increase.

At the conclusion of the hearing, the trial court took the motion under advisement and later issued a written memorandum and order granting the motion to suppress. The trial court concluded that because the Defendant was driving in excess of the speed limit, the initial stop "was not unreasonable" but also ruled that detaining the Defendant in the police vehicle and asking questions

"unrelated to speeding" or "officer safety" violated constitutional limits. Further findings by the trial court as summarized by the Court of Criminal Appeals, were as follows:

> [The officer] did not initiate the computer check on the [D]efendant's license and registration until approximately two minutes after placing the [D]efendant in the back of the squad car and four minutes after initiating the traffic stop. After the call to U.S. Customs, [the officer] continued for four minutes to ask questions unrelated to the speeding offense.
>
> [The officer's] questions exceeded both the *duration* and *subject matter* of the stop.
>
> Contrary to the state's argument, the [D]efendant's responses to the officer's questions were an insufficient basis for extending the detention.
>
> The only possible indicator of criminal activity . . . was the [D]efendant's nervousness. Nervousness alone is seldom sufficient for finding reasonable suspicion, and although it could suffice under certain circumstances, those circumstances are not present in this case.
>
> From numerous viewings of the video tape of the traffic stop, the court cannot [ac]credit [the officer's] testimony that the [D]efendant appeared nervous at the beginning of the stop and that the nervousness escalated. Nothing about the [D]efendant's appearance on camera suggested that he was nervous enough to raise a reasonable suspicion of criminal activity . . . .
>
> Any nervousness that the [D]efendant did exhibit was likely a result of being locked in the backseat of a police car while Nichols retained his driver's license. The [D]efendant not only did not feel free to leave, but he was physically unable to do so . . . .

In a supplemental order, the trial court also ruled that even though the Defendant voluntarily consented to the vehicle search, the consent was not sufficiently attenuated from the unlawful detention so as to allow the admission of the illegal drugs. The Court of Criminal Appeals affirmed the order of suppression, concluding that the officer's conduct, patting down the Defendant and placing him in the back of the patrol car, amounted to an illegal "frisk and sit." The intermediate court also ruled that the consent to search was not sufficiently attenuated from the illegal conduct.

In this appeal, the State contends that both the trial court and the Court of Criminal Appeals erred by suppressing the cocaine discovered in the vehicle. In the alternative, the State asserts that the consent to search was voluntary and so unrelated to the unlawful seizure as to permit the admission of the evidence.

**Standard of Review**

The standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, the findings are binding upon this Court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions and the trial court's findings of fact are subject to de novo review. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000).

**Analysis**

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. See U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997). This Court has recognized three categories of police interventions with private citizens: a full scale arrest, which requires probable cause; a brief investigatory detention, requiring reasonable suspicion of wrong-doing; and a brief police-citizen encounter, requiring no objective justification. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). "While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as the consent to search. See State v. Cox, 171 S.W.2d 174, 179 (Tenn. 2005). "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Davis v. Mississippi, 394 U.S. 721 (1969); Terry v. Ohio, 392 U.S. 1, 16-19 (1968)). Reasonableness is the "touchstone of the Fourth Amendment." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz, 389 U.S. at

360); see also Skinner v. Ry. Labor Executives' Assn., 489 U.S. 602, 619 (1989); State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006). These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Mun. Court, 367 U.S. 523, 528 (1967)).

This Court has previously held that our state constitution offers more protection than the corresponding provisions of the Fourth Amendment. See, e.g., State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989); State v. Lakin, 588 S.W.2d 544, 549 (Tenn. 1979). As under the federal constitution, evidence obtained as a result of a warrantless search or seizure "is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629. The State bears the burden of proof when a search or seizure is conducted without a warrant. Id.

### I. The Initial Stop

An automobile stop constitutes a "seizure" within the meaning of both the Fourth Amendment to the United States Constitution, see Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990); Delaware v. Prouse, 440 U.S. 648, 653 (1979), and article I, section 7 of the Tennessee Constitution, see State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).[1] As a general rule, if the police have probable cause to believe a traffic violation has occurred, the stop is constitutionally reasonable. Whren v. United States, 517 U.S. 806, 810 (1996). In this case, the State concedes that the Defendant was seized when the officer initiated the traffic stop. Similarly, the Defendant concedes that the officer had probable cause based upon his excessive speed to conduct the traffic stop.

Because the Defendant was driving eight miles per hour over the posted limit, Officer Nichols had probable cause to initiate a traffic stop. In consequence, he was authorized pursuant to Tennessee Code Annotated section 55-10-207 to issue a traffic citation. See Tenn. Code Ann. § 55-10-207(a)(1) (2004) ("Whenever a person is arrested for a violation of any provision of . . . chapter 8 . . . of this title . . . , punishable as a misdemeanor, . . . the arresting officer shall issue a traffic citation to such person in lieu of arrest, continued custody and the taking of the arrested person before a magistrate."). Although there is no federal constitutional prohibition against an arrest for a minor traffic offense, see Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (holding that the Fourth Amendment permits custodial arrest on the basis of probable cause that an individual has committed even a minor traffic violation), our statute precluded the officer from doing so in this case, see Tenn. Code Ann. § 55-10-207(a)(1) (2004). In State v. Walker, 12 S.W.3d 460 (Tenn. 2000), this Court concluded that Tennessee's "cite and release" statute, Tennessee Code Annotated section 40-7-118, created a "a presumptive right to be cited and released for the commission of a misdemeanor." Id. at 464. Full custodial arrest is permitted only when one of the statutory

---

[1] "The correct spelling of the defendant's name is 'Pulley'; however, it is cited by West Publishing Company as 'Pully.'" Yeargan, 958 S.W.2d at 636 n.5 (Reid, J., concurring).

exceptions is met. Tennessee Code Annotated section 55-10-207 makes reference to the "cite and release" statute and provides that the same exceptions apply. See Tenn. Code Ann. § 55-10-207(f) (2004). None of the statutory exceptions, however, are present in this instance.

As indicated, the initial stop of the Defendant's vehicle was constitutionally permissible. The United States Supreme Court has held, however, that "[i]t is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005) (citing United States v. Jacobsen, 466 U.S. 109, 124 (1984)). Moreover, a well-recognized authority on the Fourth Amendment has addressed the "routine traffic stop" as follows:

> Given that police can easily come by a factual basis for a traffic stop, that such stops are often motivated by drug-enforcement purposes, and that there exists virtually no basis for questioning the initiation of such a stop because of its pretextual or arbitrary nature, it is apparent that the permissible dimensions of a lawful traffic stop are matters of some importance.

Wayne R. LaFave, The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment, 102 Mich. L. Rev. 1843, 1862 (2004).

### II. Pat-down of the Defendant and Placement in the Patrol Car

After the Defendant gave the officer his driver's license and registration, the officer asked the Defendant to step out of his vehicle. The officer explained that he did so for his own safety, a constitutionally justifiable purpose. See Pennsylvania v. Mimms, 434 U.S. 106, 109-11 (1977) (holding that an officer may, as a matter of course, ask that a driver step out of the vehicle during a traffic stop). As he complied with the request, the Defendant asked permission to remove his jacket from the car. The officer responded by saying, "I'm going to let you have a seat back here." He then patted down the Defendant and placed him in the secured area of the patrol car. At that point, the Defendant was no longer free to leave, a fact the officer acknowledged during the suppression hearing. Further, the Defendant could not have opened the back door from the inside.

The officer, who did not ask for a computer check on the license and registration before placing the Defendant in the back of the patrol car, provided a variety of explanations for placing the Defendant there. Initially, he contended that he had done so for safety reasons. Later, he added, "[P]lus it was also raining." He ultimately admitted, however, that he used the detention as an investigatory tool. He explained that he wanted to determine whether the Defendant's anxiety level increased when he was placed in the police vehicle.

The United States Supreme Court has observed that "[t]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Prouse, 440 U.S. at 654. The Court has also held that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed

-6-

should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. at 500. In State v. Cox, 171 S.W.3d 174 (Tenn. 2005), this Court adopted the rationale of the U.S. Supreme Court in Royer, making the following observations:

> The duration of [a traffic] stop, however, must be "temporary and last no longer than necessary to effectuate the purpose of the stop." "The proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." A traffic stop may be deemed "unreasonable," if the "'time, manner or scope of the investigation exceeds the proper parameters.'"

Id. at 179-80 (citations omitted).

The United States Supreme Court has ruled that an officer may order the occupants out of the vehicle during a traffic stop:

> Against this important interest [of officer safety] we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as de minimis. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a "'petty indignity.'" What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

Mimms, 434 U.S. at 111 (citation omitted). On the other hand, the placement of a driver into the backseat of a patrol car cannot be described as "de minimus" or a "mere inconvenience." A process involving a frisk and placement into the back of a locked patrol car is more akin to a full-scale arrest than the brief detention generally incident to an ordinary traffic stop. After a traffic violation, a driver can generally expect "to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). "The government's general interest in criminal investigation, without more, is generally insufficient to outweigh the individual interest in ending the detention." United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001).

Other jurisdictions considering the issue have permitted the "frisk and sit" for officer convenience if placement in the patrol car is the least intrusive means of avoiding a dangerous

condition outside the vehicle. For example, in State v. Lozada, 748 N.E.2d 520 (Ohio 2001), the Ohio Supreme Court held as follows:

> [D]uring a routine traffic stop, it is reasonable for an officer to search the driver for weapons before placing the driver in a patrol car, if placing the driver in the patrol car during the investigation prevents officers or the driver from being subjected to a dangerous condition and placing the driver in the patrol car is the least intrusive means to avoid the dangerous condition.

748 N.E.2d at 526. In Wilson v. State, 745 N.E.2d 789 (Ind. 2001), the Indiana Supreme Court observed that it could "envision various particularized circumstances (including, for example and without limitation, inclement weather, the lack of available lighting for paperwork, the need to access equipment with the detained motorist, etc.) that may make it reasonably necessary for police to require a stopped motorist to enter a police vehicle," but nevertheless concluded that "[a]n officer is not using the least intrusive means to investigate a traffic stop if, without a particularized justification making it reasonably necessary, he places a person into his patrol vehicle and thereby subjects the person to a pat-down search." Id. at 793. Similarly, the Minnesota Supreme Court has ruled that "a reasonable basis must exist" for an officer to ask a driver to wait in the patrol car during a routine traffic stop. See State v. Varnado, 582 N.W.2d 886, 891 n.4 (Minn. 1998).

As to the frisk, the United States Supreme Court has granted "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. The Court has ruled that there is no justification for an exception to the warrant requirement for a search incident to a traffic stop, observing that "[t]he threat to officer safety from issuing a traffic citation, however, is a good deal less than in the case of a custodial arrest." Knowles v. Iowa, 525 U.S. 113, 117 (1998). The Court concluded that the interest of officer safety was sufficiently protected in a traffic stop setting through the search power permitted under Terry. See id. at 117-18; see also LaFave, 102 Mich. L. Rev. at 1869 (for a discussion of this doctrine). That is to say, an officer may conduct a pat-down for weapons if he has reasonable suspicion that the driver may be armed. Knowles, 525 U.S. at 117-18.

As stated, Officer Nichols had probable cause to stop the Defendant's vehicle and issue a citation for speeding. He did not, however, write a citation and admittedly intended from the outset to ask for consent to search the vehicle. Without any suspicion that the Defendant was armed or dangerous, the officer frisked the Defendant and placed him in the back of the patrol car before checking the validity of his driver's license or vehicle registration. Despite the State's insistence that the officer placed the Defendant in the patrol car to shield him from the rain and cold, the record establishes that the officer placed the Defendant in the patrol car primarily to determine whether he became more nervous. Moreover, the videotape of the traffic stop, which also includes several other traffic stops conducted by Officer Nichols over the course of the three-day period, refutes the explanation offered by the State. In six of those detentions, all of which occurred at roughly the

same location on Interstate 40, the driver was asked to step outside the vehicle. Of those six, four were frisked and placed into the backseat of the patrol car. Only the Defendant's stop involved inclement weather. That the officer conducted a "frisk and sit" in those instances regardless of the weather or the time of day supports our conclusion that the extended detention in this case lacked a reasonable basis.

While in this case Officer Nichols' intuition and persistence frustrated the illegal activities of the Defendant, a fact that would otherwise merit praise, our approval of this particular "frisk and sit" would deviate from generations of law in this area. The Supreme Court has warned that "illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." Boyd v. United States, 116 U.S. 616, 635 (1886).[2] Moreover, those jurisdictions that permit a detention like this during a routine traffic stop do not allow a pat-down for weapons in the absence of reasonable suspicion. See, e.g., Lozada, 748 N.E.2d at 524 ("[D]uring a routine traffic stop, it is unreasonable for an officer to search the driver for weapons before placing him or her in a patrol car, if the sole reason for placing the driver in the patrol car during the investigation is for the convenience of the officer."). Other jurisdictions have concluded that a pat-down for weapons is permissible before placing a person into a patrol car so long as there was a reasonable basis for the placement. As stated by one New York court, "Although a police officer may reasonably pat down a person before he places him in the back of a police vehicle, the legitimacy of that procedure depends on the legitimacy of placing him in the police car in the first place." People v. Kinsella, 527 N.Y.S.2d 899, 899 (N.Y. App. Div. 1988).

Officer Nichols lacked a reasonable basis for placing the Defendant into the secured area of his patrol car and also lacked an independent basis for the frisk. The Court of Criminal Appeals so held, regardless of whether the duration and scope of the subsequent interrogation exceeded constitutional limits. In our view, that is the proper analysis.

### III. Consent to Search

In the alternative, the State argues that even if the "frisk and sit" was improper, the Court of Criminal Appeals erred by concluding that the Defendant's consent to search his vehicle was not sufficiently attenuated from the constitutional impropriety. The State also argues that our decision in State v. Garcia, 123 S.W.3d 335 (Tenn. 2003), should be overruled because it conflicts with the landmark decision of the United States Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218 (1973).

Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances. See Schneckloth, 412 U.S. at 227; Cox, 171 S.W.3d at 184.

---

[2] Examples of when it might be reasonable to place a driver in the secured area of a patrol car are: where a dangerous crowd threatens the officer and driver, see Lozada, 748 N.E.2d at 524; during inclement weather, see State v. Mertz, 362 N.W.2d 410, 413 (N.D. 1985); and failure to produce a driver's license during a traffic stop as required by state law, see State v. Evans, 618 N.E.2d 162, 167 (Ohio 1993).

The consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Simpson, 968 S.W.2d 776, 784 (Tenn.1998) (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn.1992)). "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." Cox, 171 S.W.3d at 185 (citing Schneckloth, 412 U.S. at 225-26).

In Garcia, this Court observed that "'a consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality.'" Garcia, 123 S.W.3d at 346 (citing Wayne LaFave, 3 Search and Seizure § 8.2(d) at 656 (3d ed. 1996)). We utilized the factors established in Brown v. Illinois, 422 U.S. 590, 603-04 (1975), for determining whether a voluntary confession was sufficiently attenuated from an unlawful seizure. Those factors are "1) the temporal proximity of the illegal seizure and consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." Garcia, 123 S.W.3d at 346. This Court acknowledged that "'[a] brief time lapse between a Fourth Amendment violation and consent often indicates exploitation [of the prior illegal police action] because the effects of the misconduct have not had time to dissipate.'" Id. (quoting State v. Hansen, 63 P.3d 650, 666 (Utah 2002)). By the application of these factors to the illegal "frisk and sit" procedure, the Court of Criminal Appeals ruled that the Defendant's consent to search was not sufficiently attenuated from the intrusive act. We agree.

In Schneckloth, the Court stated that "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." 412 U.S. at 228. While in Garcia this Court acknowledged that "the Brown factors were designed to aid courts in determining whether a confession was obtained by exploitation of an illegal arrest," we concluded that "these factors may also be used by courts to evaluate whether the causal connection between an unlawful seizure and a subsequent consent has been broken, i.e. whether the primary taint of an unlawful seizure has been sufficiently attenuated from the voluntary consent." Garcia, 123 S.W.3d at 346. Our ruling in Garcia upholds the principle that when consent to search is not sufficiently attenuated from an unlawful seizure, it is presumptively the product of coercion.

In this case, the Defendant consented to the search of his vehicle while he was unlawfully detained in the secured area of the officer's patrol car. The trial judge, who saw and heard the witnesses firsthand, determined that the consent was the direct result of the unconstitutional detention. There was no temporal separation between the illegal act and the consent. Further, there were no intervening circumstances separating the two events. Finally, in this instance, "the purpose and flagrancy of the official misconduct" weighs marginally in favor of the Defendant. As in Garcia, a drug interdiction officer rather than a traffic officer conducted the stop. The detection of illegal drugs rather than the enforcement of the traffic laws was the apparent purpose of the detention. See Garcia, 123 S.W.3d at 347-48 ("Kohl's status as a member of the drug task force adds to the likelihood that her prolonged and unreasonable detention of the defendant was for the sole purpose of obtaining consent to search his vehicle."). In our view, the Defendant's consent to the vehicle search was the end product of his unlawful detention.

**CONCLUSION**

In these specific circumstances, the arresting officer violated the state and federal constitutions by frisking the Defendant and placing him in the secured area of his patrol car. Because the consent to search was not adequately attenuated from the unlawful detention, the judgments of the trial court and Court of Criminal Appeals suppressing the evidence seized during the search of the Defendant's vehicle are affirmed.

Because the Defendant is indigent, costs of the appeal are taxed to the State.


_____
GARY R. WADE, JUSTICE