IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 11, 2014 Session

**STATE OF TENNESSEE v. MICHAEL TERRELL MCKISSACK**

**Appeal from the Criminal Court for Davidson County**
**No. 2010B1016     Mark J. Fishburn, Judge**

**No. M2013-00533-CCA-R3-CD     Filed 06/04/2014**

The defendant, Michael McKissack, was found guilty by a jury of especially aggravated robbery, aggravated robbery, and facilitation of attempted carjacking. Prior to trial, the defendant moved to suppress evidence recovered pursuant to a stop of the vehicle he was riding in, asserting that the search violated his Fourth Amendment rights. The trial court denied the motion to suppress. The defendant was sentenced to imprisonment for twenty-two years for the especially aggravated robbery, ten years for the aggravated robbery, and four years for the facilitation of attempted carjacking. The trial court ordered the defendant's aggravated robbery and facilitation of attempted carjacking convictions to be served concurrently with each other but consecutively to his especially aggravated robbery conviction. The defendant appeals, challenging the sufficiency of the evidence, the trial court's denial of his motion to suppress, and the imposition of consecutive sentences. After review, we conclude the evidence was sufficient to support the convictions, the trial court correctly denied the motion to suppress, and the imposition of consecutive sentences was proper. We affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Rob McKinney, Nashville, Tennessee, for the appellant, Michael Terrell McKissack.

Robert E. Cooper, Jr., Attorney General & Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Sarah Davis and Dina

1

Shabayek, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

After joining a group of four young men intent on committing a robbery, the defendant participated in robbing one victim and then robbing and shooting another. The five men were apprehended as they drove away from the crimes, and ski masks such as those used in the robberies, along with property stolen from the shooting victim, were found in the car. One of the co-defendants, Keith Potter, filed a motion to suppress this evidence, and the defendant joined in the motion. At the hearing, Officer Brent Hoadley testified regarding his arrest of the five men.

Officer Hoadley testified that at 6:20 a.m. on January 20, 2010, he received a call regarding a robbery at Lincoya Bay Apartments. Officer Hoadley was two miles away and immediately activated his blue lights and proceeded to the scene. Another officer with a trainee followed him in a separate vehicle. The dispatch informed Officer Hoadley that the suspects were driving a light blue or light tan Honda Civic hatchback with tinted windows. He was also alerted to be on the lookout for the victim's car, a blue and white Honda Civic hatchback with tinted windows. The 911 call, introduced at the hearing, reveals that the first victim, Cerina Guerrero, described the suspects' car as a tan vehicle with dark tinted windows but that she did not provide a make or model over the telephone. The suspects were three short black males wearing dark clothing. The first victim was able to get part of the suspects' license plate number: an "8," a "5," a "6," and an "X," and the license plate numbers and description of the suspects were relayed to Officer Hoadley.

Officer Hoadley arrived at the apartment complex in two to three minutes, and there was not much traffic at that early hour. It was drizzling rain and "in between" dark and light when he arrived. He testified that two apartment complexes were accessible off of one road, Lincoya Bay Drive. This road was the only entrance to the apartments; there was only one way in and one way out.

Officer Hoadley was about to turn into the entrance to the apartments when he saw a vehicle generally matching the description of the suspects' car. The vehicle was a light-colored silver, two-door Honda with tinted windows. Because his siren was already on, he shut the siren off and honked his horn, and the car stopped at the intersection. He could see two men up front and could tell there were passengers in the back. He could tell the occupants were black. He stopped his patrol car with the nose pointing to the driver's

2

side, and he walked behind the car to the passenger's side as another officer approached the driver. As he walked behind the car, Officer Hoadley saw that the tags had an "8," a "5," a "6," and an "X." At this point, he could see that there were five black men in the car and that at least one had dreadlocks. Officer Hoadley testified that he was receiving dispatches contemporaneously with the stop and that at some point, he was alerted there had been a second robbery and shooting where the suspects were black men with dreadlocks wearing dark clothing. The 911 recordings indicated that a bystander from a bus stop had called regarding the shooting, describing a black man dressed in white screaming and running from a black man wearing black and with a gun. The bystander heard a gunshot after escaping to his home. The second victim's girlfriend also described the shooting, telling the 911 operator that two very young-looking black men wearing black had shot her boyfriend, Roman Sanders, and that she had seen them run.

Officer Hoadley asked the passenger to open the window, and the passenger rolled the window partially down. Officer Hoadley could see that the majority of the men were wearing all dark clothing. The men stated that they did not live in the complex but were on their way to school. Officer Hoadley elaborated that they said that they were picking up someone to go to school, which did not make sense given that the car was full and none of the occupants lived in the complexes. They appeared nervous and were "not telling [Officer Hoadley] a whole lot."

Because he knew that the perpetrators of the crimes were armed and because he could not keep an eye on all five of the car's occupants at once, Officer Hoadley asked the men to get out of the car. They were immediately patted down and handcuffed. Officer Hoadley acknowledged having previously testified that he opened the door through the window and that his supplement said he was "pulling" the men out of the car. They were separated and placed in patrol cars due to the rain. After they stepped out, he saw a brown wallet on the floorboard behind the passenger's seat, two ski masks, and one dark bandana. He testified that one of the dispatches had stated that masks were used. After an officer told him that a wallet had been taken, Officer Hoadley picked up the wallet and discovered it belonged to the second victim. A cell phone was also recovered.

The trial court denied the motion to suppress, and the case proceeded to trial. At trial, Kevin Boone, a co-defendant,[1] testified that in the early morning hours of January 20, 2010, he, his twin brother Keith Boone, Kortez Potter Woods,[2] and Mr. Woods's brother, Keith

---

[1]The defendant was not tried together with any of the co-defendants.

[2]The transcript spells Mr. Woods' first name "Cortez," but it is written as "Kortez" in the indictment.

3

Potter, had been socializing at a basketball game and at clubs. He and Mr. Potter had court in the morning, so they were planning to sleep at the same house. Around 1:00 or 2:00 a.m., they went to Mr. Potter's house in Donelson, where the defendant, known as "Ratchett," was apparently asleep. The four men were in Kevin Boone's car, which was a silver, two-door Honda Civic with tinted windows. Mr. Boone's[3] twin, Keith, was driving, and according to Mr. Boone's testimony, Mr. Potter decided to pick up the defendant and go on a robbing spree.

When they pulled up to Mr. Potter's house, three of the men stayed in the car while Mr. Potter went to wake the defendant. The two spoke at the front of the house, and the defendant initially refused to participate in the robberies but eventually relented to Mr. Potter's pressure and went to change clothes. According to Mr. Boone's testimony and photographs of the men at the time of their arrest, the twins were wearing white tops and the other three men were dressed in all black clothing. Mr. Boone's twin had a .38 special pistol under the passenger's seat, but Mr. Boone did not see any other guns until after the first robbery. The men chose to go to an apartment complex on the theory that there would likely be someone walking around in the early morning hours.

At the complex, the men saw a woman who would become the first victim, and Mr. Potter instructed Mr. Boone's twin to stop the car. The defendant, Mr. Potter, and Mr. Woods got out, while the Boone twins remained in the vehicle during both crimes. Mr. Woods had a zip-up ski mask, and the defendant had a camouflage bandana. Although it was still mostly dark, Mr. Boone could see that someone had drawn a gun and aimed it at the first victim, but he could not tell who had the gun. He then saw one of his companions get into the woman's car and start it. Apparently, they could not operate the stick shift, and Mr. Boone saw the car jerk as the attempt to drive it failed. Mr. Woods returned to the car first and informed the twins that they had not gotten anything from the victim.

The first victim, however, testified that the men took her possessions. On January 20, 2010, she was preparing to leave for work around 6:10 or 6:15 a.m. She had her school bag, her keys, and her phone with her. The first victim testified that her car had numerous aftermarket additions, including a custom stick shift which would be difficult for someone unfamiliar with the vehicle to drive. She was at the door of her blue and white Honda Civic hatchback when she saw three people running toward her. The men were dressed in all black and at least two wore ski masks. The men were not tall or heavyset. She estimated that they were around five feet, four or five inches tall and weighed one hundred forty or fifty pounds. She did not remember if one of the men was five feet ten, as she had said in her statement

_____

[3]We will use "Mr. Boone" to refer to Kevin Boone and will identify his twin brother, Keith Boone, by reference to him.

4

to police. Two were wearing hoodies, and she saw short dreadlocks coming out of the hoodie of one man. She could tell that the men were black because she could see their skin through the holes in the masks.

One man pointed a gun between her eyes and demanded her money. He then searched her pockets. Another man took her backpack. The men also took her keys, phone, cigarettes, gum, and lighter. Her wallet was in the car. The men told her to run, and she did. As she ran, she saw the car they had come in, a tan or light brown Honda Civic with tinted windows. The robbery victim was able to write down some of the numbers and letters from the car's license plate and convey these to the 911 operator. She was able to hear the perpetrators start her car, which had an unusually loud engine due to aftermarket additions. She ran to a friend's house and called police from there. Officer Brian Gant testified he later found her backpack in the middle of the lane in the parking lot.

Mr. Boone testified that after the first robbery, Mr. Woods returned to the car. He sat in the front seat and did not get out for the second robbery. Mr. Potter and the defendant also walked back to the car; however, they did not want to leave without having gained something of value, so they "took off." Mr. Boone at this point saw that the defendant had a .357 silver revolver.

The victim of the second robbery and shooting testified that he had left his work at around 6:00 a.m. and had just stepped out of his car in front of his home when he saw two men running towards him with guns. The men were wearing dark clothing, hoodies, and ski masks. One had long dreadlocks and carried a black gun, and the other had short dreadlocks and carried a chrome gun. Testimony from the co-defendant and photographs of the suspects at the time of their arrest established that the defendant had short dreadlocks, Mr. Potter and Mr. Woods had longer dreadlocks, and the twins had short hair. The second victim testified that the men were around five feet ten or eleven inches tall. The second victim screamed as he ran from the armed men, and the man with short dreadlocks said, "Get down you b-tch, I should shoot your a-s for screaming like a little b-tch." The second victim lay face-down on the ground and remained that way until after the men left. The man with longer dreadlocks searched his bag. The man with shorter dreadlocks searched his pockets and took his wallet and phone. The man with short dreadlocks was agitated because there was nothing in the victim's wallet, and he demanded the victim's personal identification number ("PIN"). The victim gave him a fake PIN. At some point prior to the shooting, the victim's girlfriend opened the door and witnessed the robbery. He told her to shut the door.

After obtaining all the victim's property and a fake PIN, the man with short dreadlocks shot him from two to three feet away as he lay on the ground. The bullet went through his abdomen. The victim pretended to be dead until he heard the men leave. In

excruciating pain, the second victim crawled up some steps to his door and tried to verify his identity to his girlfriend, who was afraid to let the robbers into the house where the children were. The second victim's girlfriend had called the police before he got into the house. He testified that his stomach had swollen to the size of a watermelon due to internal bleeding, that he had multiple surgeries, that part of his intestines were removed, and that he still had pain and difficulty with normal bowel functions two years after the crime. He also had a large scar on his stomach.

The second victim's girlfriend confirmed that she opened the door and witnessed the robbery. She testified that she had heard the second victim scream and looked for him out of the windows but could not see him. She heard him speaking and initially thought he might be on the phone. She shouted to him from inside, and when he did not respond, she opened the door. She saw him lying on the ground with two men standing over him. The men were relatively short and skinny. They wore dark clothing, and the way they held their arms indicated to her that they were armed. The victim's girlfriend testified initially that she was not sure if the men were black or white, then said, [T]hey were not white." She acknowledged having earlier testified that she could not identify their race. She locked the door and ran upstairs to call 911. She testified she heard a gunshot, but she acknowledged having testified six days after the crime that she did not know when she heard the shot. She testified that she was now sure it was after she opened and closed the door because she would not have opened the door if she had thought there was shooting. She also acknowledged having testified that the men ran away after she opened the door. However, she clarified that they only took a few steps and that she immediately shut the door. When she got downstairs, the second victim was knocking on the door.

Mr. Boone testified that he wanted to leave after the first robbery, but they waited for the defendant and Mr. Potter, in part because Mr. Potter's brother was in the car. When they heard a gunshot, they started driving and picked the two up after about five minutes. When the two got in, Mr. Potter sat in the passenger's seat and was shouting, "What the f-ck you shooting for?" They then saw the police coming toward the road into the apartment complex. Mr. Potter asked for the defendant's gun and threw the gun out of the window. Mr. Boone's twin also gave Mr. Potter a gun which Mr. Potter threw away.

Mr. Boone acknowledged that he was facing significant jail time for the crimes and that he hoped to receive a benefit by testifying. However, he testified that he did not currently have any bargain with prosecutors for his testimony. He also acknowledged having lied during his January 20, 2010 interview with police, where he stated he was asleep during the whole crime. He also asserted that his prior statement that the defendant had said he shot the victim because the victim was running was a lie and that, at the time, the defendant gave no reason for shooting the victim. He acknowledged that he did not come forward with his

6

current version of events until October 2011, and he further acknowledged this was after he had received the State's discovery, which included witness statements.

Officer Hoadley's testimony at trial was substantially similar to his testimony at the motion to suppress hearing. However, he testified that he was at the entrance to the complexes in one minute at most and only testified to two numbers and a letter given on the dispatch and matching the license plate. He testified from a photograph that the car's license was 858-XQD. He stated that he initiated the stop by blasting his siren several times and that he then exited his vehicle and verbally instructed the vehicle to stop. He testified that the call regarding the first robbery came in at 6:21 a.m. and that the call regarding the second came five to ten minutes later at most. He also testified he found bullets in Mr. Boone's twin brother's pocket during the pat-down and that he found more than one cell phone in the car.

Officer Stephen Jenkins testified he found a revolver along the roadway into the apartment complex and that he saw another officer find another revolver along the same road. One revolver was black, and one was silver.

Officer Tim Matthews testified he documented the crime scene. Due to heavy rain, it was impossible to get fingerprints from many of the items. He testified that although officers covered the guns with plastic, the guns were soaking wet. A pair of brown gloves was also found by the side of the road near the guns. He testified that the black gun was loaded but none of the cartridges in it had been fired. The chrome gun contained one spent cartridge as well as live rounds. Two unfired cartridges were recovered from the vehicle. Two ski masks, three black socks, one black glove, two bandanas, a Serus hood, and the victim's wallet were recovered from the vehicle.

The defendant did not testify. The jury proceeded to convict him of especially aggravated robbery and aggravated robbery as charged in the first two counts, and it convicted him of the lesser-included offense of facilitation of attempted carjacking in the third count.

At the sentencing hearing, the second victim testified regarding the long-term physical effects of the shooting, including continuing pain and difficulty with bowel functioning. He testified that he and his family were fearful. The family experienced severe financial hardship due to missed work. Both victims testified to being fearful in crowds. The first victim testified she no longer left home at night, was afraid of headlights, and was afraid to get into her car. She testified she lost her job because she was afraid to work the late shift it required. An employee of the Department of Children's Services ("DCS") testified that the defendant was under the supervision of DCS as a delinquent at the time of the crimes. He had been taken into custody for the theft of a vehicle and evading arrest, and he had

several prior probation violations. He was technically still on probation as a juvenile at the time of the crimes, although he had reached his eighteenth birthday. The defendant's record with DCS indicated that his reading and math skills were on a first grade level. The DCS employee was unable to give information regarding whether the defendant received the psychological care he needed while in custody. The defendant had been diagnosed with ADHD and depression following the death of his mother. After he was released from custody, he was enrolled in a mentoring program, but the DCS employee could not specify other services he received. While incarcerated for these crimes, the defendant had been in several fights and had been in possession of weapons.

The trial court decided to enhance the sentence based on the defendant's previous history of criminal convictions in addition to those necessary to establish the range, the fact that the second victim's fiancee was also a victim, the fact that he was on release into the community, and the fact that he had been adjudicated guilty of crimes as a juvenile that would have been felonies if committed by an adult. It also found that the defendant was the leader in the commission of the especially aggravated robbery. The court found the defendant's youth, his upbringing, and his environment to be mitigating factors. The trial court found that the defendant was a dangerous offender and that the crime indicated he had little or no regard for human life and no hesitation about shooting. The court found that the circumstances were aggravated, that confinement was necessary to protect society from the defendant's unwillingness to live a productive life, and that the aggregate sentence length was reasonable in light of the offenses of which he stood convicted, particularly emphasizing the fact that the second victim was lying face-down and had yielded all his property when the defendant decided to shoot him. The trial court sentenced the defendant to twenty-two years for the especially aggravated robbery, ten years for the aggravated robbery, and four years for the facilitation of attempted cajacking. The sentence for especially aggravated robbery was to run consecutively to the others for an aggregate sentence of thirty-two years.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The defendant asserts that the evidence was insufficient to sustain his aggravated robbery and facilitation of attempted carjacking convictions because his identity was not established as the perpetrator of these crimes.

When an appellate court reviews the sufficiency of the evidence, it must determine whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). If the evidence is insufficient to support a

8

finding of guilt beyond a reasonable doubt, the conviction must be set aside. Tenn. R. App. 13(e). On review, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). The appellate court may not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). The trier of fact resolves questions about the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Accordingly, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The defendant bears the burden of showing that the evidence was insufficient to sustain the verdict, and the presumption of innocence is replaced by a presumption of guilt. *Hall*, 8 S.W.3d at 599. The standard of review is the same for circumstantial and direct evidence, and the prosecution has no duty to rule out every hypothesis save that of guilt beyond a reasonable doubt. *State v. Dorantes*, 331 S.W.3d 370, 379, 381 (Tenn. 2011).

The defendant was convicted of aggravated robbery, which is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, when, as charged here, it is accomplished with a deadly weapon or by display of an article used or fashioned to lead the victim to reasonably believe it is a deadly weapon. T.C.A. §§ 39-13-401, -402(a)(2010).

To prove especially aggravated robbery, the State had to establish beyond a reasonable doubt both that the robbery was accomplished with a deadly weapon and that the victim suffered serious bodily injury. T.C.A. § 39-13-403(a). Serious bodily injury includes injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. T.C.A. § 39-11-106(a)(34).

To convict the defendant of facilitation of attempted carjacking, the State had to show that the defendant, knowing that another intended to commit the felony, but without the intent required for criminal responsibility, furnished substantial assistance in the attempt[4] to

---

4

Attempt is committed when the accused "[i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be" or "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101. We note that "[i]t is no defense to prosecution for criminal attempt that the offense attempted was actually committed." T.C.A. § 39-12-101(c).

take a motor vehicle from the possession of another by use of a deadly weapon or by use of force or intimidation. T.C.A. § 39-11-403(a); § 39-12-101; § 39-13-404(a).

The proof at trial included the testimony of an accomplice to the crime. Accordingly, it was also necessary for the State to introduce "'some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it. . . .'" *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572, 580 (Tenn. 2004)).

The defendant's argument that the State failed to establish his identity as the perpetrator has no merit. The proof at trial, seen in the light most favorable to the State, established that three men wearing black clothing and ski masks took the first victim's property, including her car keys, at gunpoint. One of the perpetrators had short dreadlocks. The men had arrived in a light-colored Honda Civic with tinted windows and a license plate including the characters "8," "5," and "X." Two men wearing black clothing and ski masks then robbed the second victim at gunpoint, and the one with the chrome gun, who had shorter dreadlocks, eventually shot him. The defendant was discovered within minutes of the crime leaving the apartment complex where the crime took place. He was in a light-colored Honda Civic with tinted windows and a license plate including the characters "8," "5," and "X." He was wearing all black clothing and had shorter dreadlocks. He was accompanied by two other men wearing all black and sporting longer dreadlocks. Their car contained ski masks and the second victim's wallet. Two guns, one black and one chrome, were discovered on the roadside in the vehicle's wake. Mr. Boone, a co-defendant, testified that the defendant and the other two men wearing black had exited the car and robbed a woman. He testified that the defendant was carrying a chrome gun when he returned and that the defendant and Mr. Potter then went out to commit another robbery. When they returned, Mr. Potter asked the defendant why he had shot the gun. One cartridge in the chrome gun had been fired.

The crux of the defendant's argument seems to be that the presence of two additional co-conspirators in the car exonerates him because the State did not prove that he was not one of the two who remained in the car. However, even if the evidence did not show that the three men who left the car to commit both robberies were wearing all black, that the defendant and two companions were wearing all black while the Boone twins were wearing white, that the man who shot the second victim with the chrome gun had shorter dreadlocks, and that the defendant had shorter dreadlocks, and even if the co-defendant had not implicated the defendant as one of the men who left the car to commit the crimes, the defendant would still be guilty of the crimes under a theory of criminal responsibility. T.C.A. § 39-11-402 ("A person is criminally responsible for an offense committed by the conduct

10

of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."); *State v. Marcus Pope*, __ S.W.3d __, No. W2012-00033-SC-R11-CD, 2013 WL 6869850, at *4 (Tenn. Dec. 30, 2013) ("Presence and companionship with the perpetrator before, during, and after the commission of the crime are circumstances upon which a juror may infer the defendant's participation."). The proof, moreover, showed that the defendant took property from both victims through violence, that he employed a deadly weapon, that one victim suffered extreme pain and permanent scars and impairment, and that, knowing his co-defendants intended to commit a carjacking, he furnished substantial assistance in the attempt to take a motor vehicle from the possession of the first victim by use of a deadly weapon. We conclude the evidence is sufficient to support the verdicts.

## II. Suppression of Evidence

The defendant next asserts that the trial court erred in denying his motion to suppress. The defendant insists that Officer Hoadley's stop of the vehicle was unlawful and that the evidence seized as a result should not have been admitted at trial.

A trial court's findings of fact at a suppression hearing are binding on the reviewing court unless the evidence preponderates against them. *State v. Talley*, 307 S.W.3d 723, 728 (Tenn. 2010). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the hearing is afforded the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000). A trial court's application of law to the facts is reviewed de novo. *Talley*, 307 S.W.3d at 729. The determination of whether reasonable suspicion existed to support a traffic stop is a mixed question of law and fact. *State v. Garcia*, 123 S.W.3d 335, 342 (Tenn. 2003). "Further, appellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012)

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *State v. Day*, 263 S.W.3d 891, 901-02 (Tenn. 2008) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Put another way, the seizure begins when, in view of all the attendant circumstances, a reasonable person would not have felt free

to leave. *State v. Hanning*, 296 S.W.3d 44, 49 (Tenn. 2009). An automobile stop constitutes a seizure. *State v. Berrios*, 235 S.W.3d 99, 105 (Tenn. 2007). Generally, a seizure occurs when police stop a vehicle using flashing blue lights, *Day*, 263 S.W.3d at 902, although the activation of lights does not constitute a detention in certain circumstances, such as when the lights are activated for safety reasons, *Hanning*, 296 S.W.3d at 49.

A warrantless search or seizure is presumed unreasonable, and unless the search was conducted under one of the "narrowly defined" exceptions to the requirement for a warrant, the evidence may be subject to suppression. *Garcia*, 123 S.W.3d at 343 (quoting *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). One of these exceptions is a seizure which consists of a brief investigatory stop "based on reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Id.* (quoting *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000)). Reasonable suspicion, although a less demanding standard than probable cause, requires more than an "inchoate and unparticularized suspicion or 'hunch.'" *Day*, 263 S.W.3d at 902 (quoting *Terry*, 392 U.S. at 27). It must be supported by specific and articulable facts which, together with their rational inferences, reasonably warrant the intrusion. *Day*, 263 S.W.3d at 902-03. Reasonable suspicion must be judged by an objective standard. *Hanning*, 296 S.W.3d at 49. It is a fact-intensive inquiry taking into account the totality of the circumstances, including the content and reliability of information available to police. *Day*, 263 S.W.3d at 903. The totality of the circumstances includes an officer's observations; information from other law enforcement personnel or agencies; information from citizens; known patterns of criminal offenders; and deductions based upon experience. *Williamson*, 368 S.W.3d at 474.

In this case, Officer Hoadley's lights were already operating as he sped toward the scene of the crime. He testified that he initiated the stop by honking or blasting his siren. Accordingly, the question is whether he had reasonable suspicion, supported by specific and articulable facts, at the time that he indicated to the occupants of the car that they must stop. Officer Hoadley testified that he received the dispatch regarding the robbery and that it took him between one and three minutes to arrive at the crime scene. The robbery took place in what was essentially a dead-end road, so anyone leaving the crime scene would have had to have driven back up the road, as the defendant and his co-conspirators were doing. It was very early in the morning, and there was very little traffic. When Officer Hoadley approached the road leading to the apartments, he observed a car. Officer Hoadley testified that it was a drizzly dawn. While the car was silver rather than tan, the limited visibility made it reasonable that the match in the shade – a light color – trumped the difference in hue.

In *State v. Hanning*, a police officer received information from an anonymous source that a black tractor-trailer with "GoSmith" written on it was driving recklessly and had just taken a certain exit ramp. *Hanning*, 296 S.W.3d at 46. The officer was very close to the

ramp and as he drove toward it, he observed a black tractor-trailer parked in the emergency lane with its parking lights on. *Id.* at 46. The officer turned on his emergency lights and drove the wrong way down the ramp; when he approached the door of the vehicle on foot, he was able to see the "Smith" logo. *Id.* at 47. The Tennessee Supreme Court held that the officer had reasonable suspicion to stop the tractor-trailer in part "because the offense was reported at or near the time of its occurrence, and the report indicated that the caller was witnessing an ongoing offense; the report provided a detailed description of Mr. Hanning's truck, its direction of travel and location; and Sergeant Russell verified these details within moments of the dispatch reporting the tip." *Id.* at 54.

Here, given the early hour and light traffic, the general similarity of the co-defendant's car with the description of the suspects' vehicle and license number information, the proximity of the vehicle to the crime physically, the layout of the complex which had only one route in and out, and the fast response of police, we conclude that Officer Hoadley had reasonable suspicion to initiate a brief investigatory stop.

"[I]t is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Berrios*, 235 S.W.3d at 106 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). After initiating the stop, Officer Hoadley asked the occupants of the car to step out in order to ensure his safety.

The defendant contends that asking the occupants to step out constituted a search of the car that was prohibited by the Fourth Amendment. However, the Tennessee Supreme Court has noted that a lawful stop "authorizes officers, as a matter of course, to require drivers to exit their vehicles," concluding that the intrusion is de minimis when weighed against the importance of officer safety. *State v. Donaldson*, 380 S.W.3d 86, 92-93 (Tenn. 2012). In *Donaldson*, the defendant had been stopped for a traffic citation. *Id.* at 88. When he was asked to step out of the vehicle, a bag of cocaine became visible on the floorboard. *Id.* at 89. Likewise, in this case, the defendant was lawfully stopped by police when the act of exiting the two-door vehicle made the ski masks and wallet visible on the floor behind the passenger's seat. At the same time, Officer Hoadley received information that masks had been used in the robberies and that a wallet had been taken from one victim. We further note that the purpose of having the occupants step out was to pat them down for weapons. A protective frisk is warranted if the officer has a reasonable, particularized suspicion that the suspect is armed. *Williamson*, 368 S.W.3d at 474. The Tennessee Supreme Court has noted that the nature of the crime may be a factor in evaluating the officer's reasonable suspicion. *Id.* Here, Officer Hoadley was responding to a call regarding a robbery in which a firearm had been used. Accordingly, he had a reasonable, particularized suspicion that the occupants might be armed. As part of the investigatory stop, Officer Hoadley could ask the

13

occupants of the car to step out without running afoul of the Fourth Amendment. *Berrios*, 235 S.W.3d at 107 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). It was while the suspects were exiting the vehicle that the ski masks and wallet became visible within plain view. After being patted down for weapons, the men in the car were handcuffed and placed into police vehicles.

We further consider that, by the time the occupants were asked to exit the car, Officer Hoadley had received significant additional information. First, he observed that the license plate had at least three characters matching the number given by the victim.[5] When he made contact with the car's occupants, he saw that three of the men's clothing matched the victim's description; this was also the number of persons who had accomplished the first robbery. The men in the car could give no plausible reason for being present in the complex, asserting that they were picking up a friend for school although the car had no empty seats. They acted nervous and did not answer questions fully. After they exited the vehicle, masks such as those used in the robberies were visible. The defendant does not contest that probable cause existed to arrest him at the conclusion of the stop. We conclude that law enforcement had reasonable suspicion to conduct a brief investigatory stop of the vehicle and that the evidence in question was in plain view when police lawfully asked the occupants to step out of the car. Accordingly, the trial court did not err in denying the defendant's motion to suppress the evidence.

### III. Sentencing

Finally, the defendant challenges the trial court's decision to run the convictions for aggravated robbery and facilitation of attempted carjacking consecutively to the especially aggravated robbery conviction. The defendant contends that the trial court failed to make the findings required under *Wilkerson* when it based consecutive sentencing on its conclusion that the defendant was a dangerous offender.

A trial court may order sentences to be served consecutively under Tennessee Code Annotated section 40-35-115(b) if it finds that one of seven enumerated factors applies by a preponderance of the evidence. The trial court elected to run some of the sentences consecutively based on its finding that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The imposition of consecutive sentences is reviewed for abuse of discretion accompanied by a presumption

---

[5]

During the suppression hearing, Officer Hoadley testified that four characters matched, but during trial, he testified that three characters matched. The 911 call and photographs of the car indicate that the victim thought the second "8" in the license plate was a "6."

of reasonableness.  *State v. Pollard*, __ S.W.3d __, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *7 (Tenn. Dec. 20, 2013).  The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of factors in Tennessee Code Annotated section 40-35-115(b). *Id.* at *9.  When the only factor supporting consecutive sentencing is the finding that the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), the trial court must make additional findings as set out in *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).  It must find that the aggregate sentence is "'reasonably related to the severity of the offenses'" and "'necessary in order to protect the public from further criminal acts.'"  *Pollard*, 2013 WL 6732667, at *10 (quoting *Wilkerson*, 905 S.W.2d at 938 ).  If the trial court fails to make the requisite findings, the appellate court may either conduct a de novo review to determine whether there is an adequate basis for the imposition of consecutive sentences or remand to the trial court so that it may consider the appropriate factors and make the proper findings. *Id.* at *11.

Here, the presumption of reasonableness applies.  The trial court found in particular that the nature of the shooting, in which the victim had already given up all his property, was lying on the ground, and posed no threat to the defendant, supported finding the *Wilkerson* factors.  We conclude that the trial court did not abuse its discretion in ordering the aggravated robbery and carjacking sentences to run consecutively to the sentence for especially aggravated robbery.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.  Because the judgment sheets for the defendant's convictions for especially aggravated robbery and aggravated robbery have check marks in both the box marked "pled guilty" and the one marked "jury verdict," we remand to the trial court for the correction of these forms to reflect the fact that the defendant was convicted by a jury.

_____
JOHN EVERETT WILLIAMS, JUDGE