FILED
08/28/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2017

## STATE OF TENNESSEE v. ROBERT LAMAR KELLEY

**Appeal from the Criminal Court for Wilson County**
**No. 13-CR-339      Brody N. Kane, Judge**

_____

### No. M2016-01425-CCA-R3-CD

_____

Following the trial court's denial of his motion to suppress, the Defendant-Appellant, Robert Lamar Kelley, entered a guilty plea in the Wilson County Criminal Court to the charged offense of possession of more than ten pounds of marijuana, a Class D felony, for which he received a sentence of four years, with service of six months in confinement and the remainder on supervised probation. See T.C.A. §§ 39-17-417(a)(4), (g)(2). As a condition of his guilty plea, Kelley properly reserved two certified questions of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2) regarding the stop and search of his vehicle. After reviewing the record, we find no error in the denial of the motion to suppress and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Comer L. Donnell, District Public Defender; Kelly A. Skeen (on appeal and at trial) and Shelley Thompson (at trial), Assistant Public Defenders, for the Defendant-Appellant, Robert Lamar Kelley.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Jason L. Lawson, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Factual Background. After receiving a tip from a confidential informant, police stopped a truck driven by Kelley and found eleven pounds of marijuana. Following his indictment, Kelley filed a motion to suppress the drugs found in his vehicle.

At the suppression hearing, Kenneth Powers, a narcotics detective for the Lebanon Police Department who was assigned to the Drug Enforcement Administration (DEA) Drug Task Force in Nashville, testified that he received information from a confidential informant that Kelley and Timothy Haddock were trafficking marijuana. Detective Powers explained that in addition to the DEA, the Tennessee Bureau of Investigation (TBI), as well as the Nashville and Lebanon Police Departments were investigating Kelley for drug trafficking.

Detective Powers' criminal informant told him that Kelley and Haddock were driving to the Smithville, Tennessee area to receive a load of 50 to 100 pounds of marijuana from some Hispanic individuals.[1] He stated that this particular informant had provided reliable information in the past that had been independently corroborated by police. In addition, this informant had made several controlled drug buys from other defendants in unrelated cases.

When Detective Powers asked the informant how he became aware of Kelley's and Haddock's marijuana trafficking, the informant said that he lived with Kelley and Haddock, which allowed him to have first-hand knowledge of their drug activities. The informant told Detective Powers that Kelley would often travel to his "stash house" in Dowelltown, Tennessee, where he would pick up a shipment of marijuana that Hispanic drug couriers had delivered. Detective Powers acknowledged that he had no information showing that the informant had ever been to Kelley's home in Dowelltown.

Thereafter, in October 2011, Investigator Mike Galluzzi[2] of the Nashville Police Department executed a search warrant on Kelley and Haddock's residence in Old Hickory, Tennessee, and found 44 to 47 pounds of marijuana. Detective Powers said the same confidential informant involved in the current case against Kelley informed him that the Nashville Police Department had just discovered a substantial amount of marijuana at Kelley and Haddock's Old Hickory residence, and Detective Powers contacted Investigator Galluzzi to discuss the details regarding the discovery of this marijuana. Detective Powers said the discovery of the marijuana at the Old Hickory residence further corroborated what the informant had told him about Kelley and Haddock's trafficking marijuana.

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

[2] Although the transcript from the suppression hearing refers to this individual as Mike Galousey, this individual is identified as Mike Galluzzi in several other portions of the record.

On May 22, 2012, this informant told Detective Powers that Dennis Anderson was going to meet Haddock that afternoon to pick up a half-pound of marijuana at Kelley and Haddock's Old Hickory residence. The police conducted surveillance at the Old Hickory address, and at around 2:00 p.m., they observed Haddock entering and exiting the house and going to a home across the street. Then Haddock left his home and drove to a tobacco shop, where he met Anderson in the parking lot. The officers saw Haddock and Anderson exchange a plastic bag while looking under the hood of one of their vehicles. The police later stopped Anderson in Lebanon for a speeding violation and found a half-pound of marijuana in a yellow plastic bag, which also corroborated the information the confidential informant had given to Detective Powers.

On June 6, 2012, Detective Powers obtained a warrant to install a Global Position System (GPS) tracking device on Kelley's Ford Ranger truck. He stated that the probable cause for the tracking order was based on the information the informant had given him regarding Kelley's pattern of drug activities with Haddock as well as his interviews with other detectives, including Investigator Galluzzi. Detective Powers acknowledged that there was no mention of Kelley's home in Dowelltown in the warrant or affidavit for the GPS device. After obtaining the warrant, police installed the tracking device on the truck on June 8, 2012, and began tracking Kelley's movements. Sometime prior to the suppression hearing, the company that provided the GPS tracking service for Kelley's vehicle was purchased by another company, and the GPS records showing Kelley's movements were destroyed.

On June 13, 2012, Detective Powers observed a controlled drug buy by the TBI, wherein Powers' confidential informant and an undercover agent purchased more than an ounce of marijuana from Haddock at the same tobacco shop where the May 22, 2012 drug transaction between Anderson and Haddock took place. After this controlled buy, the informant told Detective Powers that Haddock was Kelley's "right hand man," that Kelley was Haddock's supplier, and that Kelley "called the shots." Detective Powers said he spoke with his criminal informant on a weekly basis prior to Kelley's stop, although he did not recall speaking to him on June 20, 2012, the day of Kelley's stop in this case. He said his informant told him several times that Kelley was using his home in Dowelltown as a "stash house."

On June 20, 2012, Detective Powers monitored the tracking device on Kelley's vehicle and discovered that Kelley was driving east on Interstate 40 past Wilson County in the direction of his home in Dowelltown. Detective Powers immediately informed TBI agents in the area regarding Kelley's movement and began following Kelley's vehicle, a Ford Ranger truck, to establish surveillance. Because Detective Powers was afraid he would be seen, he conducted surveillance from a safe distance and continued to monitor Kelley's movements through the GPS device. Detective Powers saw Kelley pull

into an area near Kelley's residence in Dowelltown, which made him believe his criminal informant had given reliable information about Kelley picking up a shipment of marijuana there.

Kelley subsequently left his Dowelltown residence, and Detective Powers and the TBI agents followed him from a distance. As Kelley returned to Lebanon, Tennessee, Detective Powers contacted Detective Eric Brockman of the Lebanon Narcotics Unit and asked him to wait at mile marker 245 so Detective Brockman could take over physical surveillance of Kelley's vehicle and conduct a "wall off stop," meaning a traffic stop where officers have reasonable suspicion or probable cause to believe that a narcotics transaction has occurred. Detective Powers believed, at the point when he contacted Detective Brockman, that he had reasonable suspicion to stop Kelley and to conduct a narcotics investigation on the basis that Kelley's vehicle contained marijuana. This reasonable suspicion was based on the information regarding Kelley's drug trafficking activities and his "stash house" in Dowelltown that he had learned from his informant as well as Kelley's actions in going to the house in Dowelltown.

At the time of this call, Detectives Brockman and Rickles were travelling behind Kelley, and Detective Powers was following behind these detectives. Detective Powers continued to monitor the tracking device on Kelley's vehicle, which told him Kelley's speed and location. When Kelley's truck reached mile marker 239, Detective Powers observed, via his monitoring of the tracking device, that Kelley's vehicle was travelling 78 miles per hour, 8 miles per hour over the posted speed limit. The officers, who were in unmarked cars, continued to follow Kelley into Wilson County, and Detective Powers contacted Officer Jason Toporowski of the Lebanon Police Department to tell him that they were following Kelley's Ford Ranger and that they wanted him to stop Kelley. Detective Powers told Officer Toporowski that Kelley's vehicle was speeding, travelling seventy-eight miles per hour in a seventy-mile-per-hour zone, and asked Officer Toporowski to "[t]ry to develop any of his own probable cause that he could."

Officer Toporowski testified that when he received the telephone call from Detective Powers, he suspected that the stop of Kelley's vehicle involved narcotics because Detective Powers was a narcotics detective. Shortly after receiving this call, at approximately 4:40 p.m., Officer Toporowski activated his blue lights and conducted a stop of Kelley's vehicle at mile marker 235. Officer Toporowski admitted that he did not personally observe Kelley speeding or engaging in illegal activity prior to the stop. He said he never wrote Kelley a ticket for speeding because Detective Powers had observed the speeding violation. Officer Toporowski stated that he stopped Kelley because he had received a call from Detective Powers asking him to conduct the stop. He confirmed that a video recording was taken of the stop and that the recording accurately depicted what occurred during the stop.

Officer Toporowski said that when he stopped Kelley's truck, he walked to the driver's side of the vehicle and observed Kelley in the driver's seat and Haddock in the passenger seat. He asked both men for identification and then returned to his patrol car to have the dispatcher conduct a license check for both men. Officer Toporowski said that Trooper Russell Peters, who was passing by, stopped to provide assistance, although he had not specifically asked Trooper Peters to stop. After giving Kelley's and Haddock's license numbers to the dispatcher, Officer Toporowski said he approached Kelley's truck again and asked for Kelley to exit the vehicle.

Officer Toporowski said Kelley exited his vehicle and, at his request, walked to the front of Officer Toporowski's patrol car. For his own safety, Officer Toporowski patted down Kelley to ensure that he did not have any weapons on his person, though he admitted no one had told him Kelley was armed. Because Kelley's pockets were bulging, he asked Kelley to remove the contents of his pockets, and Kelley took out nearly $6000 cash from his pockets and placed it on the hood of the patrol car.

Officer Toporowski said that in response to his questioning, Kelley said he did not have anything illegal in his vehicle. When Officer Toporowski asked Kelley if he would mind if he took a look in his truck, Kelley questioned why this was necessary, and Officer Toporowski said it was his job to ask. During this conversation, Officer Toporowski's supervisor called to check on him, and he replied that he was fine. Officer Toporowski returned to his conversation with Kelley and asked him a second time if he could search the truck because Kelley had not given him a direct answer the first time, and Kelley replied, "I don't mind," which Officer Toporowski interpreted as Kelley's consenting to a search of his vehicle. He added that Kelley never limited his consent to search his vehicle in any way. He said that just after Kelley consented to the search of his truck, the dispatcher informed him that Kelley and Haddock did not have any outstanding arrest warrants. He then conducted a search of Kelley's truck. At that point, the audio portion of the recording malfunctioned, although Officer Toporowski asserted that he had not turned off the audio.

When Officer Toporowski started to search the truck, Officer Bates arrived to help him. Nothing was found during the search of the inside of the truck. However, during the search, Officer Toporowski observed "an odd lock" on the toolbox attached to the bed of the truck. After finishing the initial search, Officer Toporowski returned to Kelley and asked him what was in the toolbox, and Kelley said it contained "tools and stuff" because he did "construction." When Officer Toporowski asked if he could "take a look," Kelley replied, "I can't get it open, I don't have the key" because he had "lost it or didn't have it." Officer Toporowski, who had Kelley's keys in his hand at the time, asked if one particular key fit the lock, and Kelley responded, "I don't know." When Officer Toporowski asked if he would mind if he tried this key, Kelley said, "[G]o ahead."

Officer Bates immediately got into the back of the truck, and Officer Toporowski gave him Kelley's keys before going back to his patrol car to return a phone call from Detective Powers.

During this phone call, Officer Toporowski told Detective Powers that they had gotten Kelley's consent to search the truck but had not found anything yet. When he added that they were trying to gain access to the tool box, Detective Powers told him they were sending a K9 unit to the scene. Seconds later, Officer Bates turned around, and Officer Toporowski could tell that "something wasn't right." Officer Toporowski ended his telephone conversation and exited his patrol car. He said when Officer Bates used one of Kelley's keys, he was able to open the lock on the tool box and discovered the marijuana, which weighed approximately 11 pounds. Officer Toporowski asserted that the lock on the tool box was never forced open or broken in order to gain access to its contents. After Officer Bates found the marijuana, Officer Toporowski told Detective Powers about the drugs, and Kelley and Haddock were taken into custody and brought to talk to the detectives. Officer Toporowski asserted that if Kelley had told him not to look in his truck, then he would not have searched it.

Trooper Russell Peters also testified that Kelley consented to the search, stating that when Officer Toporowski asked him if they could search the truck the first time, Kelley replied, "I don't mind," and then the second time, Kelley "shrugged like, yeah, go ahead." Trooper Peters said he did not recall what he discussed with Kelley after Officer Toporowski began searching the vehicle but stated, "I'm sure I was just doing pleasantries and small talk to keep him occupied." He said he would not have gone along with the search of Kelley's truck if Kelley had refused to give consent.

Later that day, Kelley was interviewed by Detective Powers at the police station after waiving his Miranda rights. During this interview, Kelley was cooperative, agreed to speak with police, and gave consent for officers to search another piece of property.

The video recording of Kelley's stop was viewed by the trial court during the suppression hearing. The recording showed that Officer Toporowski followed Kelley's vehicle for a few seconds before activating his blue lights and siren to stop him. As Kelley stopped his vehicle on the shoulder of Interstate 40 West at mile marker 235, Officer Toporowski asked the dispatcher to send him another unit. He then approached Kelley's truck and identified himself by name before telling Kelley that he was driving "78 back there in a 70." Officer Toporowski asked for both men's driver's licenses and the vehicle's registration before inquiring where the Kelley and Haddock were going. The men replied that they were driving to Daytona on vacation. After he received the licenses and registration, Officer Toporowski returned to his patrol car and asked the dispatcher to check the license numbers for Kelley and Haddock. Over the radio, another

officer notified Officer Toporowski that he was in route. Shortly thereafter, Trooper Peters arrived on the scene, and Officer Toporowski and this trooper approached Kelley's truck. Officer Toporowski asked Kelley to step outside his vehicle, and Kelley exited the truck, stopping to leave a few items inside his truck. Officer Toporowski asked Kelley if he had "anything illegal on him like knives, guns, drugs," and Kelley admitted that he had a knife, which Officer Toporowski took from him and gave to Trooper Peters before informing Kelley that he needed to conduct a pat-down search. Officer Toporowski conducted the pat-down search while restraining Kelley's hands and noted that Kelley had something in the pockets of his cargo shorts. When he asked Kelley what it was, Kelley responded that he had a wallet, and Officer Toporowski stated, "There's a bunch in there." Officer Toporowski asked Kelley to walk over to his patrol car. He then asked Kelley if he minded if he reached in and grabbed what was in his pockets, and Kelley agreed. Officer Toporowski subsequently removed what appeared to be large amount of cash as well as a wallet from Kelley's pockets. He then asked Kelley if he had "any weapons or anything like that in the back of your truck," and Kelley's response cannot be heard. When Officer Toporowski continued to search his pockets, Kelley made a statement that cannot be heard, and Officer Toporowski replied, "It is just part of our job, what we're kinda out here doing." After emptying Kelley's pockets, he released the restraint on Kelley's hands and asked if he had "anything illegal in the back of the vehicle," and Kelley said, "No," and shook his head in the negative. Then Officer Toporowski asked, "Mind if I take a look?," and Kelley, stated, "Uh, I mean, I don't mind" and then asked why it was necessary, and Officer Toporowski said, "That's just part of our job." When Officer Toporowski again asked, "You don't mind if we take a quick look," Kelley said, "I guess not." Officer Toporowski approached Kelley's truck while Kelley and Trooper Peters conversed in a friendly manner, although their conversation was not captured on the audio portion of the recording. Officer Toporowski then requested Haddock to exit the vehicle and when he asked Haddock if he had anything "on him," Haddock said, "No." Officer Toporowski conducted a quick pat-down search of Haddock. He did not remove anything from Haddock's pockets before asking Haddock to walk with him to the front of his patrol car. At that point, the audio from the microphone on Officer Toporowski's uniform stopped functioning. Officer Toporowski approached Kelley's truck and held up two items that had been placed on the car's hood, and he returned them to Kelley before walking back to Kelley's truck. Officer Toporowski opened the driver's side door of the truck as Officer Bates, a motorcycle officer, arrived on the scene and began assisting with the search of Kelley's truck. At the time, Trooper Peters continued to engage in friendly conversation with Kelley and Haddock and received a telephone call. Officer Toporowski and Officer Bates continued to search the truck and opened both the driver's and passenger's doors to the truck, although most actions related to the search were obscured because Kelley and Haddock were blocking the camera's view of the truck. Officer Toporowski walked back to his patrol car and appeared to ask Kelley a question, and when he heard Kelley's

response, Officer Toporowski nodded and returned to Kelley's truck. A few seconds later, Officer Bates climbed into the back of Kelley's truck, and Officer Toporowski returned to sit in his patrol car, where the audio resumes from the microphone inside the patrol unit. Officer Toporowski told someone over the radio or a cell phone that they "haven't found a thing." An instant later, Officer Bates opened a duffle bag in the back of Kelley's truck. Officer Toporowski told the person he was talking to that he had to go as Trooper Peters and Officer Bates quickly handcuffed Kelley and Haddock and placed them in the back of Officer Toporowski's patrol car. A few seconds later, Officer Bates climbed back into the back of Kelley's truck and picked up the duffle bag, which caused either Kelley or Haddock to curse as they are sitting in the patrol car. Officer Bates brought the bag to the hood of Officer Toporowski's patrol car and, in the presence of Officer Toporowski, removed two large bales wrapped in plastic wrap. Either Kelley or Haddock then said, "Well, that's it."

At the suppression hearing, Kelley testified that that Officer Toporowski asked him if he could search his truck two or three times, and Kelley replied that Officer Toporowski could look at "whatever is in plain view" but that he could not "search through [his] vehicle." He claimed that he clearly told Officer Toporowski that he could not search his truck, which was why he kept asking for consent to search. Kelley also claimed he was protesting the search to Trooper Peters on the video recording but that that particular portion of the recording did not have audio. He said that when he saw Officer Toporowski going through the back of his truck, he asked why he was searching his vehicle, and Trooper Peters responded, "I'm just here for support or back up." Kelley claimed that he did not have a key to the tool box and that the tool box had "a lock that you could jimmie open."

At the conclusion of the suppression hearing, the trial court denied the motion to suppress. While it did not enter a written order, the court made the following oral findings of fact and conclusions of law at the end of the hearing:

> I've reviewed the video tape, watched it twice before we ever got here. I've had an opportunity to read the Defendant's brief, which was very helpful to me. I read the cases as well. And to be honest, I did have some concerns prior to the hearing about what happened out there on the side of the road.
>
> After hearing the proof, watching the witnesses, because I didn't know exactly what the State's witnesses were going to say, I do believe that reasonable suspicion existed to make the stop, both with the speeding allegation based on the GPS review that [Detective] Powers testified to as well as the ongoing drug issues[.]

I do believe, based on the experience and the corroboration from this confidential informant [that] this confidential informant is definitely reliable. Some other transactions occurred which were foretold by this confidential informant, so I am satisfied upon that as well with of course the [informant's] basis of knowledge. I am satisfied that reasonable suspicion existed to make the stop on the side of the road.

Then we get to the issue of consent. Folks, like I said, I listened to this twice on my laptop at the office. I couldn't hear it, I didn't hear it the first time through when we watched it today, but on the second run through it was pretty evident to me, and this was replayed again I believe two more times after that, when the Defendant was asked, does he mind if I search the car, he says, no, I mean, I don't mind. And then it goes on. You can't hear everything that was said thereafter, but I consider that valid consent based on what I watched.

It's true, [the State] asked if he was protesting and that sort of thing, and I don't believe the Defendant would have been required to scream and go crazy trying to object to the search of the vehicle, but I do believe by my observations of his demeanor from the stop after the statement was made to Officer Toporowski [that his demeanor was] not consistent with one that was continuously objecting or protesting what was going on.

I credit the testimony of Trooper Peters with respect to their conversation, what was said. He was right there within four or five feet of the conversation with his back to the traffic and he testified that he gave consent. He even indicated that had Officer Toporowski had persisted with a search of the vehicle against his consent that he would not have gone along with it.

So, I'm satisfied based on the testimony I've heard that this is a legal and valid stop based on the reasons given by [the prosecutor] in his closing. I'm satisfied that that's what occurred in this matter. Albeit, when I came in today, I wasn't. I did have some concerns, but after hearing the proof and seeing that it wasn't like this tool box got pried open by some special pliers or something like that, it appears it was opened. There was a little bit of discrepancy on whether it was a key that opened it or not. I don't believe Officer Toporowski knew exactly how it was opened, but there was no evidence that it was actually pried open by a crow bar or something along those lines.

So, based on my review of the facts and the video tape and my observations of the witnesses, their demeanor, I find that it is a valid stop, a valid seizure of evidence, so I'm going to allow that evidence to be used at the trial in this matter on Wednesday.

Following the denial of his motion to suppress, Kelley entered a guilty plea to possession of marijuana in excess of ten pounds and properly reserved the following two certified questions of law:

(1) Did the trial court err in finding the stop of the defendant's vehicle was supported by reasonable suspicion that the defendant was transporting illegal controlled substances, sufficient to permit a <u>Terry</u> stop, and therefore that the stop was constitutionally permissible? If the aforesaid question is answered in the affirmative, then did the trial court err in finding the stop of the defendant's vehicle was supported by a reasonable suspicion that the defendant was committing a traffic violation (travelling in excess of the speed limit), sufficient to permit a <u>Terry</u> stop, and therefore the stop was constitutionally permissible?

(2) If the stop is valid, did the trial court err in finding the search of the defendant's vehicle was pursuant to the defendant's valid consent, and therefore the search was constitutionally permissible?

## ANALYSIS

Kelley argues that the trial court erred in denying his motion to suppress the evidence found in his truck. He claims that his stop was not supported by reasonable suspicion that he possessed marijuana or was speeding. He also asserts that he never consented to a search of his truck. We conclude that because the stop and the search of Kelley's vehicle were constitutionally permissible, the trial court properly denied the motion to suppress.

Although this is an appeal of two certified questions of law, we apply the same standard of review as we would in considering the underlying issue, which is the denial of the motion to suppress. <u>State v. Hanning</u>, 296 S.W.3d 44, 48 (Tenn. 2009) (citing <u>State v. Nicholson</u>, 188 S.W.3d 649, 656 (Tenn. 2006)). A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. <u>State v. Odom</u>, 28 S.W.2d 18, 23 (Tenn. 1996). The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." <u>Id.</u> Moreover, "[q]uestions of credibility of the witnesses, the weight and

value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 403, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)); see State v. Davis, 354 S.W.3d 718, 727 (Tenn. 2011).

I. **The Stop.** Kelley argues the trial court erred in finding that the stop of his vehicle was supported by reasonable suspicion that he possessed marijuana. Alternatively, he argues that the trial court erred in finding the stop was supported by reasonable suspicion that he was speeding.

One exception to the warrant requirement is a brief investigatory stop of a vehicle that is supported by reasonable suspicion. State v. Keith, 978 S.W.2d 861, 866 (Tenn. 1998). An officer may make an investigatory stop of a vehicle based upon "a reasonable suspicion, supported by specific and articulable facts, that the occupants of the vehicle have committed, are committing, or are about to commit a criminal offense." State v. England, 19 S.W.3d 762, 766 (Tenn. 2000) (citing United States v. Cortez, 449 U.S. 411, 417 (1981)); Terry v. Ohio, 392 U.S. 1, 20-23 (1968). "'[R]easonable suspicion can be established with information that is different in quality or content than that required to establish probable cause and can arise from information that is less reliable than that required to show probable cause.'" Hanning, 296 S.W.3d at 49 (quoting State v. Day, 263 S.W.3d 891, 903 (Tenn. 2008)). Moreover, the likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than that required to satisfy the preponderance of the evidence standard. State v. Lindsey A. Ochab, No. M2015-02290-CCA-R3-CD, 2016 WL 6247429, at *7 (Tenn. Crim. App. Oct. 26, 2016) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

The Tennessee Supreme Court has defined reasonable suspicion as "'a particularized and objective basis for suspecting the subject of a stop of criminal activity.'" Day, 263 S.W.3d at 903 (quoting State v. Binette, 33 S.W.3d 215, 218 (Tenn.

- 11 -

2000)). The objective standard for determining whether an officer has reasonable suspicion is whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate[.]" Terry, 392 U.S. at 21-22 (internal quotation marks and citations omitted). "'The issue of whether reasonable suspicion existed to validate a traffic stop is a mixed question of fact and law.'" Davis, 354 S.W.3d at 726 (quoting State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003)). The State bears the burden of presenting sufficient facts to establish reasonable suspicion. Day, 263 S.W.3d at 908. "[T]he reasonableness of seizures less intrusive than a full-scale arrest is judged by weighing the gravity of the public concern, the degree to which the seizure advances that concern, and the severity of the intrusion into individual privacy." State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).

A court must consider the totality of the circumstances in determining whether reasonable suspicion is supported by specific and articulable facts. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992); Binette, 33 S.W.3d at 218. These circumstances include officers' objective observations, information obtained from other law enforcement officers or agencies, information obtained from citizens, offenders' pattern of operation, and officers' inferences and deductions based on experience. Yeargan, 958 S.W.2d at 632 (citing Watkins, 827 S.W.2d at 294; Cortez, 449 U.S. at 418; Terry, 392 U.S. at 21). "[T]he content, quality, and quantity of information possessed by police must be assessed in determining whether it is sufficiently reliable to support a finding of reasonable suspicion." Keith, 978 S.W.2d at 867. In making a reasonable suspicion determination, "[o]bjective standards apply rather than the subjective beliefs of the officer making the stop." Day, 263 S.W.3d at 903 (citing State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996); Terry, 392 U.S. at 21-22). Reasonable suspicion must not rely on an officer's "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27; Hanning, 296 S.W.3d at 49.

**A. Reasonable Suspicion of Marijuana Possession.** Kelley argues that his stop was not supported by reasonable suspicion that he possessed marijuana.

First, Kelley complains that all of the information regarding his alleged drug activities came from a single criminal informant, who told Detective Powers that Kelley used his Dowelltown home as a "stash house" for marijuana trafficking. Kelley claims that this informant was not reliable because Detective Powers admitted that the informant had never been to Kelley's Dowelltown residence, Detective Powers conceded that he had not talked to the informant on June 20, 2012, the day of Kelley's stop, and Detective Powers acknowledged that he could not recall the last time his informant told him Kelley used the Dowelltown residence for drug activities.

- 12 -

When information from a confidential informant contributes to the stop of a motor vehicle, a totality-of-the-circumstances analysis may be appropriate in determining whether reasonable suspicion or probable cause exists to support the stop. Compare State v. Tuttle, 515 S.W.3d 282, 307-08 (Tenn. 2017) (overruling Jacumin and adopting the Gates totality-of-the-circumstances analysis when determining whether an affidavit establishes probable cause for issuance of a search warrant), with Day, 263 S.W.3d at 903 ("Under circumstances where the information forming the basis for a motor vehicle stop is derived from an anonymous informant, Tennessee law requires some showing of both the informant's veracity or credibility and his or her basis of knowledge."), and Keith, 978 S.W.2d at 866 (While independent police corroboration can make up deficiencies in either prong of this test for an informant's reliability, "each prong represents an independently important consideration that must be separately considered and satisfied in some way."). In conducting this totality-of-the-circumstances analysis, an informant's "veracity," "reliability," and "basis of knowledge" remain highly relevant but should not be recognized as distinct and independent requirements to be rigidly applied in each case. Id. at 303 (citing Illinois v. Gates, 462 U.S. 213, 230 (1983)). Circumstances surrounding the informant's tip, such as contemporaneous police corroboration of the tip or corroboration of several details of the informant's information, may increase the reliability of the tip. Simpson, 968 S.W.2d at 782.

When considering the reliability of the informant in this case, the trial court recognized that this informant had a long history of providing information that was later corroborated by the police, which made him credible. It also found that the informant predicted other transactions related to this case that were confirmed by the police, which established the informant's basis of knowledge that Kelley was trafficking marijuana. Detective Powers specifically testified that the informant told him he knew of Kelley's trafficking of marijuana because he lived with Kelley and Haddock, which allowed him to personally observe their drug activities. The evidence does not preponderate against the trial court's finding that the informant in this case was reliable.

Kelley also claims that reasonable suspicion to stop him was lacking because the GPS device, which allowed Detective Powers to follow him to Dowelltown and back was obtained based on information from this same confidential informant as well as information from the unrelated stop of his co-defendant Timothy Haddock. Kelley complains that the warrant application and supporting affidavit for the GPS device only referenced his residence in Old Hickory and a car lot in Smithville and did not reference his residence in Dowelltown, where he was leaving at the time to his stop. He claims that although the State tried to use the informant's information to have "built[-]in reasonable suspicion" to stop him regardless of his location, this information amounted to a "mere hunch" and fell short of the reasonable suspicion required to stop his vehicle. We have

already determined that the confidential informant in this case was reliable, and, as we will explain, the stop in this case was lawful.

At the time that Officer Toporowski stopped Kelley, the confidential informant in October 2011 had promptly alerted Detective Powers that a substantial amount of marijuana had been found by the Nashville Police Department at the residence shared by Kelley and Haddock, which corroborated the informant's claim that Kelley and Haddock were trafficking marijuana. The informant also predicted the drug transaction between Haddock and Anderson on May 22, 2012 and participated in a controlled buy of drugs from Haddock on June 13, 2012. He informed Detective Powers that Haddock was Kelley's "right-hand man," that Kelley was Haddock's supplier for the drugs, and that Kelley "called the shots" regarding the drugs. Regarding the stop in this case, the informant told Detective Powers that Kelley and Haddock were trafficking marijuana and that Kelley often travelled to his "stash house" in Dowelltown, where he would pick up shipments of marijuana that had been delivered by Hispanic drug couriers.

On June 20, 2013, Detective Powers, while monitoring the GPS device on Kelley's vehicle, discovered that Kelley was driving east on Interstate 40 past Wilson County, which indicated that Kelley might be travelling to his home in Dowelltown, and Detective Powers followed Kelley to an area near this home. When Kelley left the Dowelltown residence, Detective Powers and TBI agents followed him from a distance. As Kelley entered Lebanon, Detective Powers contacted Detective Eric Brockman and asked him to wait at mile marker 245 so Detective Brockman could take over physical surveillance of Kelley's truck for him and could conduct a traffic stop supported by reasonable suspicion or probable cause that a narcotics transaction had occurred. Detective Powers and the TBI agents continued to follow Kelley, and Detective Powers continued to monitor Kelley's movements through the GPS device installed on Kelley's truck. After Detective Powers realized that Kelley was travelling at 78 miles per hour, 8 miles per hour over the posted speed limit, he notified Officer Toporowski, who initiated the stop.

When considering whether Officer Toporowski had reasonable suspicion that Kelley was trafficking marijuana at the time of the stop, we recognize that the doctrine of collective knowledge applies in this case. The Tennessee Supreme Court has recognized this concept of collective knowledge when determining whether an officer has probable cause to arrest a suspect:

> When determining whether the police possessed probable cause, the courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer

- 14 -

or officers who possessed relevant information. Such a nexus exists when the officers are relaying information or when one officer directs another officer to act. State v. Echols, 382 S.W.3d at 278; 2 [Wayne R.] LaFave[, Search and Seizure: A Treatise on the Fourth Amendment] § 3.5(a)-(c) [(5th ed. 2012)]. It matters not whether the arresting officers themselves believed that probable cause existed. State v. Huddleston, 924 S.W.2d 666, 676 (Tenn. 1996) ("[An officer's] subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed.").

State v. Bishop, 431 S.W.3d 22, 36 (Tenn. 2014).

Because the doctrine of collective knowledge applies when determining whether an arresting officer has probable cause to arrest a particular suspect, it is logical that this doctrine also applies when determining whether an officer possessed reasonable suspicion to stop an individual. This idea of imputed knowledge has been applied by this court in the past. See State v. Bryant, 678 S.W.2d 480, 482-83 (Tenn. Crim. App. 1984) (concluding that the initial detention of the defendant by an officer who heard another officer's description of the defendant's vehicle and request for assistance over the police radio was lawful even though the officer who stopped the defendant had not witnessed any unlawful activity by the defendant). Under the concept of collective knowledge, all of the information known to Detective Powers would be imputed to Officer Toporowski at the time of the stop, so long as a sufficient nexus of communication existed. Because Detective Powers had reasonable suspicion that Kelley possessed marijuana and then directed Officer Toporowski to act by stopping Kelley, a sufficient nexus existed such that Detective Powers' reasonable suspicion was imputed to Officer Toporowski.

**B. Reasonable Suspicion Based on a Traffic Violation.** Alternatively, Kelley argues that the stop of his truck was not supported by reasonable suspicion that he was speeding. He also contends that his detention exceeded the permissible scope of a lawful traffic stop.

A police officer's initiation of a traffic stop constitutes a seizure under the United States and Tennessee Constitutions. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997); Pulley, 863 S.W.2d at 30. "As a general rule . . . the stop of an automobile is constitutionally reasonable, under both the state and federal constitutions, if the police have probable cause or reasonable suspicion to believe that a traffic violation has occurred." Vineyard, 958 S.W.2d at 734.

Kelley argues that the only proof he was speeding came from the GPS device monitored by Detective Powers and that no officer personally observed him speeding.

- 15 -

He also asserts that because his speeding offense was a misdemeanor, the officers should have given him a citation and released him in lieu of effecting a custodial arrest. See T.C.A. §§ 40-7-118(b)(1), 55-10-207(b)(1).

Initially, we note that Officer Toporowski had probable cause to initially stop Kelley based on Detective Powers' communication to him that Kelley was speeding. See Bishop, 431 S.W.3d at 36 (collective knowledge doctrine). Officers regularly enforce speeding laws by having one officer serve as the lookout with a radar gun and another officer positioned in a place where he can stop and issue citations to violators. See, e.g., Bryant, 678 S.W.2d at 483. "'It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" State v. Davis, 484 S.W.3d 138, 143 (Tenn. 2016) (quoting United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996)); see State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) ("As a general rule, if the police have probable cause to believe a traffic violation has occurred, the stop is constitutionally reasonable."); Vineyard, 958 S.W.2d at 736 (holding that officers' observation of the defendant's violations of traffic laws created probable cause justifying the stop).

Moreover, at a minimum, Officer Toporowski's stop of Kelley's truck was supported by reasonable suspicion that he was speeding. Although Kelley argues that Officer Toporowski did not personally see him speeding, this court may consider an officer's reliance upon information provided by another officers when making a reasonable suspicion determination. See Yeargan, 958 S.W.2d at 632; Watkins, 827 S.W.2d at 294. Based on the information provided by Detective Powers, Officer Toporowski had reasonable suspicion, supported by specific and articulable facts, that Kelley had committed the offense of speeding at the time of the stop.

Kelley also claims that because the GPS records documenting his speed were destroyed, the State failed to establish that he was driving in excess of the posted speed limit at the time of the stop. He asserts that although Detective Powers told Officer Toporowski that he was speeding at mile marker 239 or 240, he was not actually stopped until five miles later and that Officer Toporowski admitted he never observed Kelley doing anything illegal prior to the stop. We note that the fact that the GPS records are no longer in existence does not lessen the impact of Detective Powers' testimony that he monitored Kelley's movements through the GPS device and that Kelley's speed was eight miles over the posted speed limit just prior to the stop, which was accredited by the trial court. As we have already recognized, the information Detective Powers provided to Officer Toporowski provided sufficient reasonable suspicion to stop Kelley for speeding. We note that no constitutional violation exists if there is a valid reason for the traffic stop, even if the officers have other motives in effecting the stop. Whren, 517 U.S. at 813. Regardless of whether the officers believed that Kelley was engaged in the possession of

marijuana, Officer Toporowski had a valid reason for stopping Kelley for speeding based on the information he learned from Detective Powers.

In addition, Kelley asserts that his detention and subsequent search exceeded the scope of a lawful traffic stop for speeding. He complains that there were multiple armed officers at the scene, that he and Haddock were ordered out of the car and searched, and that these searches culminated in Officer Toporowski's reaching into their pockets while handcuffing or restraining their hands behind their backs. While it is questionable whether Kelley included this specific issue in his certified question, we will briefly address whether the detention and search in this case exceeded the scope of the traffic stop for speeding.

We recognize that "a law enforcement officer making a valid traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having some reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop." State v. Harris, 280 S.W.3d 832, 842 (Tenn. Crim. App. 2008). The duration of the stop must be "'temporary and last no longer than necessary to effectuate the purpose of the stop.'" State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). A traffic stop may become unreasonable "'if the time, manner or scope of the investigation exceeds the proper parameters.'" Id. (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001)). An officer's conduct during an investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. The proper inquiry is whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly during the detention. Troxell, 78 S.W.3d at 871 (citing Simpson, 968 S.W.2d at 783).

Even if Officer Toporowski only had probable cause or reasonable suspicion to stop Kelley for speeding, he developed reasonable suspicion that Kelley possessed marijuana during the course of the stop. Prior to the stop, Detective Powers told Officer Toporowski that Kelley had been speeding and asked him to "[t]ry to develop any of his own probable cause that he could." Officer Toporowski suspected that narcotics were involved in this stop because Detective Powers, a narcotics detective, had told him to stop Kelley's vehicle. After initiating the stop, Officer Toporowski detained Kelley while checking his driver's license and the vehicle's registration, and this detention was within the permissible scope of the traffic stop. See Harris, 280 S.W.3d at 840 (recognizing that "[r]equests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." (internal quotation marks and citations omitted)). Shortly after Officer Toporowski stopped the vehicle, he asked Kelley to step outside of the vehicle, and such requests

have been deemed only a "de minimis" intrusion or a "mere inconvenience." Berrios, 235 S.W.3d at 107. When Kelley exited his vehicle, Officer Toporowski asked him if he had "anything illegal on him like knives, guns, drugs," and Kelley admitted that he had a knife, which gave Officer Toporowski reasonable suspicion to conduct a pat-down search. See id. at 108 (stating that an officer has the authority to conduct a reasonable search for weapons for the purpose of his safety, where he has reason to believe that the suspect is an armed and dangerous individual); Terry, 392 U.S. at 27 (If an officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime," he may conduct a limited pat-down search for weapons.). A subsequent search of Kelley's person revealed that he had approximately $6000 in his pockets, which gave Officer Toporowski probable cause or, at a minimum, reasonable suspicion that a search of the vehicle would reveal narcotics. Seconds later, Officer Toporowski asked Kelley for consent to search his vehicle, and Kelley agreed to the search. We conclude that at the time Officer Toporowski made this request to search, he was diligently pursuing his investigation in a way that was likely to confirm or dispel his suspicions quickly. The video recording of the stop shows that only fifteen minutes elapsed from the initiation of the stop to the discovery of the marijuana. Almost immediately after Officer Toporowski made the request to search, Kelley agreed to the search of his truck and never objected to or limited the scope of this search, which resulted in his being detained for a longer period of time. Because the time, manner, and scope of the investigation did not exceed the proper parameters of the stop, Kelley has failed to show that the officers unreasonably detained him following the traffic stop.

**II. The Search.** Finally, Kelley argues that the trial court erred in finding that he consented to the search of his truck. He also claims that there was no proof supporting the officers' claim that they accessed the marijuana inside the toolbox with a key he provided.

When evidence is seized following a warrantless search of a vehicle, the State must prove that the search was conducted pursuant to one of the exceptions to the warrant requirement. Troxell, 78 S.W.3d at 871 (citing Keith, 978 S.W.2d at 865). One such exception is a search conducted pursuant to a person's consent. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973)); Bartram, 925 S.W.2d at 230.

The State has the burden of establishing that an individual's "'consent was, in fact, freely and voluntarily given.'" State v. Reynolds, 504 S.W.3d 283, 306 (Tenn. 2016) (quoting Schneckloth, 412 U.S. at 222). To be valid, consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Ingram, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting Berrios, 235 S.W.3d at 109). A defendant's will cannot be overborne and his act of consenting must be "the product of an

- 18 -

essentially free and unconstrained choice." State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005). Whether a person voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances. Berrios, 235 S.W.3d at 109 (citing Schneckloth, 412 U.S. at 227; Cox, 171 S.W.3d at 184, 186).

Factors to consider in determining whether an individual's consent is voluntary include the time and place of the encounter, whether the encounter was in a public or secluded place, the number of officers involved, the degree of hostility during the incident, whether weapons were displayed, whether consent was requested, and whether the consenter initiated contact with the police. Cox, 171 S.W.3d at 185. In addition, an individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel" are relevant in determining whether consent is voluntary. Id. (internal quotation marks and citation omitted). Finally, an individual's "'[k]nowledge of the right to refuse consent'" is also a factor in determining the voluntariness of consent. Id. (quoting Schneckloth, 412 U.S. at 235-47).

Even if a person's consent is voluntary, evidence seized in the search will be inadmissible if the search exceeds the scope of the consent given. Troxell, 78 S.W.3d at 871 (citing 3 Wayne R. LaFave, Search and Seizure § 8.1(c) (3d ed. 1996)). When determining the scope of consent, any express or implied limitations on the time, duration, area, or intensity of the police activity necessary to accomplish the stated purpose of the search, as well as the expressed object of the search should be considered. Id. (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)). The scope of consent is not based on the subjective intentions of the consenting individual or the subjective interpretations of the searching officer but on "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." Id. at 871-72 (quoting Jimeno, 500 U.S. at 251).

Kelley claims he told the officers they could "look around at what's [sic] ever in plain view" but that they "[did] not have consent to search [his] vehicle." He argues that the trial court should not have accredited the testimony of the officers because neither Officer Toporowski nor Officer Peters were able to recall anything said during their discussions with Kelley other than the fact that Kelley consented to a search of his vehicle. He also claims that the malfunctioning of the audio portion of the recording at the precise moment the officers claimed he gave consent is suspicious.

After hearing the testimony from Officer Toporowski, Trooper Peters, and Kelley and after reviewing the recording of the stop several times, the trial court found that when Kelley "was asked, does he mind if I search the car, [Kelley] says, no, I mean, I don't mind." The trial court also found that Kelley's demeanor supported a finding that he

consented to the search of his truck. The court stated, "I don't believe the Defendant would have been required to scream and go crazy trying to object to the search of the vehicle, but I do believe by my observations of his demeanor from the stop after the statement was made to Officer Toporowski [that his demeanor was] not consistent with one that was continuously objecting or protesting what was going on."

When considering the voluntariness of Kelley's consent, we note that at the time of the stop, Kelley was thirty-three years old. The record shows that Kelley had average intelligence and that he had prior experience with both law enforcement and the criminal justice system. In October 2011, a warrant was executed on Kelley's Old Hickory house, where officers discovered 44 to 47 pounds of marijuana, and Kelley was indicted for this offense. At the time of the stop, Kelley had prior convictions for possession of marijuana in excess of ten pounds, possession of marijuana not less than one-half ounce nor more than ten pounds, misdemeanor theft, and a weapons offense.

We next consider the details of the incident in determining the voluntariness of Kelley's consent. The video recording of the stop shows that the stop occurred in the late afternoon on the shoulder of an extremely busy interstate. While there were a total of three officers at the scene, all of these officers were professional and respectful during the course of Kelley's stop and detention. Nothing in the record suggests that the officers pressured or coerced Kelley into giving consent to search, and no officer drew his weapon during the encounter. In particular, we recognize that Officer Peters provided clear, unequivocal testimony about Kelley's consent to the search, which was accredited by the trial court, and we will not second-guess the credibility determinations made by the trial court on appeal. Considering the totality of the circumstances, we conclude that the evidence, including the video recording and the testimony from Officer Toporowski and Trooper Peters, supports the trial court's finding that Kelley consented to the search of his vehicle.

Lastly, Kelley argues that "there was no proof on the record that the officers got into the toolbox, located in the back of his truck, by any means of a key that he supplied." At the suppression hearing, Officer Toporowski testified that when he asked Kelley if any of the keys on his keychain would open the lock, Kelley responded, "I don't know." He then asked if Kelley would mind if he tried the keys, Kelley said, "[G]o ahead." Officer Toporowski stated that Officer Bates used one of the keys on Kelley's keychain to open the lock and that the lock did not have to be forced open. After hearing this proof, the trial court made the factual finding that the officers did not pry the toolbox open, and the proof does not preponderate against this finding. The record does not show that the officers exceed the scope of the consent given by Kelley. After concluding that the initial stop was justified and that the detention was reasonable in scope and duration, we further conclude that Kelley voluntarily consented to the search of his truck, which led to the

discovery of the marijuana.  Therefore, the trial court properly denied the motion to suppress.

## **CONCLUSION**

Because the stop and the search in this case were constitutionally permissible, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE